**Hiram B. ELY et al., Appellants,**

**v.**

**Richard W. VELDE, Associate Administrator, Law Enforcement Assistance Administration, et al., Appellees,**

**Natural Resources Defense Council, Amicus Curiae.**

**No. 71–1351.**

United States Court of Appeals, Fourth Circuit.

Argued Aug. 23, 1971.

Decided Nov. 8, 1971.

Emanuel Emroch, Richmond, Va. (Emroch & Kauffman, Richmond, Va., on brief), for appellants.

Vann H. Lefcoe, Asst. Atty. Gen. of Virginia (Andrew P. Miller, Atty. Gen.

of Virginia, and Anthony F. Troy, Asst. Atty. Gen. of Virginia, on brief), and Edmund B. Clark, Atty., Dept. of Justice (Shiro Kashiwa, Asst. Atty. Gen., John D. Helm, Atty., Dept. of Justice, Brian P. Gettings, U. S. Atty., and David G. Lowe, Asst. U. S. Atty., on brief), for appellees.

William Stanley, Jr., Richard B. Stewart, and Covington & Burling, Washington, D. C., on brief, for amicus curiae, National Trust for Historic Preservation in the United States.

Edward L. Strohbehn, Jr., Washington, D. C., on brief for amicus curiae, Natural Resources Defense Council.

Before HAYNSWORTH, Chief Judge, SOBELOFF, Senior Circuit Judge, and WINTER, Circuit Judge.

SOBELOFF, Senior Circuit Judge:

This appeal calls upon us to consider an alleged conflict between several recently-formulated federal policies. On the one hand, there is a congressional commitment against federal interference with a state's use of federal funds allocated to it for law enforcement; and, on the other, there are congressional mandates to all federal agencies to act so as to preserve and protect the natural environment and the historic and cultural foundations of the nation.

Appellants, who are residents of the Green Springs area of Louisa County, Virginia, brought an action to halt the proposed funding and construction in their neighborhood of a Medical and Reception Center ("Center") for Virginia prisoners. To this end, they sought to enjoin appellees Richard W. Velde and Clarence M. Coster, Associate Administrators of the Law Enforcement Assistance Administration ("LEAA"),[1] from allocating to Virginia $775,000 of federal funds for the construction of the Center.[2] The complaining residents prayed, in addition, for an injunction against Otis L. Brown, Director of the Virginia Department of Welfare and Institutions, to prevent him from locating the contemplated institution in Green Springs.

The Complaint of the residents in the District Court alleges that the National Environmental Policy Act of 1970 ("NEPA")[3] requires both the LEAA and the State of Virginia to (1) take into account, in the funding and location of the Center, the possible effects the Center might have on the Green Springs natural environment and (2) prepare an "impact statement" detailing these possible effects, before proceeding with the funding and construction of the Center.[4]

---

1. The LEAA is an agency created by the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. § 3701, et seq., charged with the administration of that Act, including the approval and allocation of federal grants to the states for various law enforcement purposes. See 42 U.S.C. §§ 3711, 3751–3769.

2. This sum is part of a "block grant" of $4,150,000 to be used by the State of Virginia for a variety of purposes. For an explanation of the term "block grant" see note 8, *infra*.

3. 42 U.S.C.A. § 4321, et seq.

4. Enacted in 1970, NEPA expresses a strong federal policy in favor of preserving the natural environment, including our "historic and cultural heritage." 42 U.S.C. § 4331. To this end, Congress has directed that "to the fullest extent possible," all laws, regulations and policies of the United States should be interpreted and administered in accordance with the policies of NEPA. 42 U.S.C. § 4332(1).

In addition to this generalized command, NEPA also imposes specific procedural requirements on "all agencies of the Federal Government." They must, in connection with "other major Federal actions significantly affecting the quality of the human environment," prepare a detailed statement of the impact the proposed action will have on the environment, including a discussion of alternatives to the proposed action. 42 U.S.C. § 4332(1)(C).

Prior to the making of such an "impact statement," the agency involved must consult with and obtain the comments of any other federal agency "which has jurisdiction by law or special expertise with respect to any environmental impact involved." *Id.*

A further claim of the residents was that the National Historic Preservation Act ("NHPA")[5] requires the LEAA and the State of Virginia to consider the effect the proposed Center will have on certain historic properties in Green Springs, and to afford an opportunity to the Advisory Council on Historic Preservation to comment on the undertaking.[6]

Since none of the procedures outlined by NHPA and NEPA was observed in deciding upon the funding and location of the Center, the appellants charge the appellees with a violation of these two statutes.

In defense of its admitted failure to comply with NHPA and NEPA, the LEAA relies upon certain provisions in Title I of the Omnibus Crime Control and Safe Streets Act of 1968 ("Safe Streets Act"),[7] pursuant to which the grant here at issue was approved. Its position is that the Safe Streets Act prohibits any interference or control of the states by the federal government in the spending of grants, except as expressly authorized by the statute.[8] Thus the LEAA claims it may not look beyond its governing statute and is prohibited, in approving grants, from reading into that statute the requirements of NHPA and NEPA.

For his part, appellee Brown, Director of Virginia's Department of Welfare and Institutions, contends that NHPA and NEPA are addressed only to agencies of the federal government and that the state and its officials, even when spending federal funds, are not obliged to follow NHPA and NEPA.

I

The Green Springs area is aptly described in the District Court's opinion:

Green Springs is an area of land consisting of approximately 10,000 acres located in the Western part of Louisa County. It is a uniquely historical and architecturally significant rural community in that almost all

---

5. 16 U.S.C. § 470, et seq.

6. NHPA, enacted into law in 1966, reflects the congressional desire "that the historical and cultural foundations of the Nation should be preserved * * * in order to give a sense of orientation to the American people * * *." 16 U.S.C. § 470. The Act provides for the creation and maintenance of a "National Register" by the Secretary of the Interior. This National Register is a list of "districts, sites, buildings, structures, and objects significant in American history, architecture, archeology, and culture." 16 U.S.C. § 470a.

Prior to the expenditure of any federal funds in an undertaking which might have an effect on anything listed in the National Register, the head of the federal agency concerned must: (1) take such effect into account in approving the funds to be spent and (2) afford an opportunity to the Advisory Council on Historic Preservation to comment in regard to the undertaking. 16 U.S.C. § 470f.

The Advisory Council on Historic Preservation, created by NHPA, advises the President and Congress, as well as state and federal agencies on matters relating to historic preservation. 16 U.S.C. § 470j.

7. 42 U.S.C. § 3701, et seq.

8. The Safe Streets Act, which was passed in 1968, is an effort to "assist State and local governments in strengthening and improving law enforcement at every level by national assistance." 42 U.S.C. § 3701. To do so, the Act provides for planning grants to subsidize the formulation of comprehensive law enforcement plans for each state. See 42 U.S.C. §§ 3721–25. Once a state has submitted its comprehensive plan to the LEAA, and the LEAA finds that the plan "conforms with the purposes and requirements of [the Safe Streets Act]," the state then becomes eligible to receive action grants to carry out its comprehensive plan. 42 U.S.C. § 3733. At this stage, there are two types of action grants available, "block" grants and "discretionary" grants. Block grants are allocated to all eligible states solely on the basis of population and without regard to need. Discretionary grants, on the other hand, are "allocated as the [LEAA] shall determine." 42 U.S.C. § 3766.

Eighty-five percent of the money appropriated by Congress for law enforcement action grants is given to the states in the form of block grants. Discretionary grants comprise the remaining fifteen percent. Id.

of the homes were built in the nineteenth century and have been maintained in substantially the same condition ever since. Three of the homes, Boswell's Tavern, Hawkwood and Westend, are on the National Register for Historic Places, as provided in [NHPA].[9]

The proposed Center will consist of at least four concrete-faced buildings, a thirty-foot guard tower and a surrounding fence. It will, in addition, contain parking facilities for 150 cars. Appellee Brown estimated that the Center would use 40,000 gallons of water per day to support its projected population of 400 to 500 inmates and 74 correctional officers.

The above facts would seem to warrant the application of the procedural requirements of both NHPA and NEPA.[10] While neither the LEAA nor the Virginia Department of Welfare and Institutions complied with these two Acts, the Virginia agency seems to have given consideration to factors such as soil and water requirements. These factors are indeed "environmental" in a sense, but other environmental or cultural factors—the very ones accented in NHPA and NEPA—were not taken into account by either of the agencies in the decisions concerning the Center.

In assessing the residents' claims, the District Court thought it was faced with an irreconcilable conflict between the Safe Streets Act on the one hand and NHPA and NEPA on the other. The court sought to resolve the problems arising from the supposed conflict by applying two familiar rules of statutory construction. First, since the Safe Streets Act was enacted *after* NHPA, the court held that the later expression of Congress must prevail, thus precluding consideration of historic and cultural factors as prescribed by the earlier NHPA.

However, as between NEPA and the Safe Streets Act, the District Court departed from the rule it previously applied and attributed prevailing force to the Safe Streets Act, despite the fact that NEPA was the later enactment. The court accepted the LEAA's interpretation which turned on an odd reading of the language of NEPA that commands all federal agencies to observe the procedural duties it imposes "to the fullest extent possible." [11] The argument advanced was that this phrase made the statute "discretionary," while the duty of the LEAA to make grants was claimed to be "non-discretionary." Reasoning from this categorization of NEPA as "discretionary" and the Safe Streets Act as "non-discretionary," the court was persuaded to apply the rule of construction that in case of conflict, a discretionary statute must yield to a non-discretionary one.

## II

We reject the appellees' basic assumption that the Safe Streets Act is irreconcilable with NHPA and NEPA.

■ The rules of thumb urged by the LEAA—namely that a later enactment controls earlier legislation and that a discretionary command must yield to a mandatory one—can be useful as aids in statutory construction. But they represent a last resort, to be invoked only when it is impossible to avoid a collision between two statutes and to effectuate both. Where reconciliation is possible, these rules of thumb do not come into play.

■ Normally there is a strong presumption against one statute repealing or amending another by implication. United States v. Welden, 377 U.S. 95, 102–103, n.12, 84 S.Ct. 1082, 12 L.Ed. 2d 152 (1964); United States v. Borden Co., 308 U.S. 188, 198–199, 60 S.Ct. 182, 84 L.Ed. 181 (1939) (there must be a

---

9. Ely v. Velde, 321 F.Supp. 1088, 1089 (E.D.Va.1970). The proposed Center will be 3 miles from Boswell's Tavern, 2 miles from Westend, and ½ mile from Hawkwood.

10. See notes 4 and 6, *supra.*

11. 42 U.S.C. § 4332.

"positive repugnancy between the new law and the old"). This circuit has similarly applied this approach several times. *See, e. g.*, Fanning v. United Fruit Co., 355 F.2d 147 (4th Cir. 1966). "When two statutes present an apparent conflict, the proper approach is to ascertain the purposes underlying both enactments, not to dispose of the problem by a mechanical rule." 355 F.2d at 149. *See also* Baines v. City of Danville, Va., 337 F.2d 579, 590–591 (4th Cir. 1964) (en banc), cert. denied, 381 U.S. 939, 85 S.Ct. 1772, 14 L.Ed.2d 702 (1964).

█ Close examination of the purposes and policies of the Safe Streets Act reveals no real antagonism to NHPA and NEPA such as would prevent effectuation of all three statutes.

The LEAA insists that it is not obliged to comply—indeed it may not comply—with NHPA and NEPA because it has been disabled, when approving block grants, from imposing any conditions not found in the Safe Streets Act itself.[12] Support for this proposition is claimed in the language and the policy inherent in the Safe Streets Act.

In 42 U.S.C. § 3733, Congress specified that:

> The [LEAA] *shall make grants* under this chapter to a State planning agency if such agency has on file with the [LEAA] an approved comprehensive State plan * * * which conforms with the purposes and requirements of this chapter. (Emphasis added.)

In addition, 42 U.S.C. § 3757 provides that grant funds under the Safe Streets Act can be withheld only if the LEAA finds that there has been a "substantial failure" of the grantee to comply with (1) the Safe Streets Act, (2) regulations and guidelines promulgated by the LEAA, or (3) the state comprehensive plan itself. The LEAA maintains that these two sections specify the only criteria that the states can be required to meet before they become entitled to a block grant. Thus, it is argued, the permissible areas of inquiry with regard to the states' plans are similarly restricted.

The LEAA urges that its reading of the Safe Streets Act is required by the unique policy underlying that Act. Characterizing this policy as a "hands off" approach to federal financial assistance to the states, the LEAA cites several statements by congressional proponents of the Safe Streets Act as indicative of an intention that the federal government play as small a role as possible in the individual states' spending of allotted funds.[13] Finally, the LEAA places additional reliance on 42 U.S.C. § 3766(a):

> Nothing contained in this chapter or any other Act shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over any police force or any other law enforcement agency of any State or political subdivision thereof.

█ Reliance in the present case is misplaced, for it is plain that the LEAA has overdrawn the "hands off" policy of the Safe Streets Act.[14] Properly read,

---

12. In its brief, the LEAA concedes, however, that it "can and will comply" with both NHPA and NEPA with respect to its *discretionary* grants to the states.

13. See 114 Cong.Rec. 14,757–758, May 23, 1968 (remarks of Senator Thurmond); 114 Cong.Rec. 14,753, May 10, 1968 (remarks of Senator Dirksen).

14. As the agency charged with the administration of the Safe Streets Act, LEAA professes that its interpretation of that Act is entitled to great weight and should not be overturned in the absence of arbitrariness or a clear error of law.

We are of the opinion that the LEAA's interpretation is entitled to no such weight. The Safe Streets Act is not the only statute under consideration here. What we are called upon to decide is the relationship of *three* statutes, each of which creates an agency charged with its own administration. And the views of these three agencies on the points at issue here are not unanimous.

The Council on Environmental Quality, as the agency created by NEPA, interprets its governing statute as binding on *all* federal agencies, "unless existing law applicable to the agency's operations ex-

neither the Act's language nor its policy prohibits or excuses compliance with NHPA and NEPA.

### III

The genesis of the "hands off" approach lies in considerations more subtle than a simple desire to give the states more latitude in the spending of federal money. The dominant concern of Congress apparently was to guard against any tendency towards federalization of local police and law enforcement agencies. Such a result, it was felt, would be less efficient than allowing local law enforcement officials to coordinate their state's overall efforts to meet unique local problems and conditions.[15] Even more important than Congress' search for efficiency and expertise was its fear that overbroad federal control of state law enforcement could result in the creation of an Orwellian "federal police force."[16]

The above-quoted section 3766(a), which forbids federal control over local police and law enforcement agencies, was the congressional solution for these problems. The legislative history reflects the congressional purpose to shield the routine operations of local police forces from ongoing control by the LEAA—a control which conceivably could turn the local police into an arm of the federal government.

Senator Eastland described the type of control over local police that was feared as

> [prescribing] the type of shoes and uniforms to be worn by local law enforcement officers, the type or brand of ammunition to be purchased and used by police departments and many other vital matters pertaining to the day-to-day operations of local law enforcement.

Sen.Rep't No. 90–1097, 90th Cong., 2d Sess., at 222 (1968).

Congress could well have been justified in its concern and was reasonable in its reaction—the adoption of section 3766 (a). However, in the absence of unmistakable language to the contrary, we should hesitate to read the congressional solution to one problem—protection of local police autonomy—so broadly as unnecessarily to undercut solutions adopted by Congress to preserve and protect other societal values, such as the natural and cultural environment. It is not to be assumed lightly that Congress intended to cancel out two highly important statutes without a word to that effect.

It is our conclusion that Congress, in enacting the Safe Streets Act, did not intend to forbid the LEAA from considering NHPA and NEPA. An LEAA requirement, in every comprehensive state plan and grant application, of enough information to assess the environmental and cultural impact of the

pressly prohibits or makes compliance impossible." CEQ Guidelines, 36 Fed. Reg. 7724 (1971). Additionally, the Advisory Council on Historic Preservation, created by NHPA, has opined that the LEAA's interpretation is in error. See Advisory Council on Historic Preservation, Issue Paper on Revenue Sharing and Historic Preservation, May 24, 1971.

The Supreme Court has recognized that administrative practice is not entitled to special weight when, as here, it clashes with the interpretation given by other agencies to statutes they were created to administer. See United States v. Townsley, 323 U.S. 557, 568, 65 S.Ct. 413, 89 L.Ed. 454 (1945). We therefore do not accord a presumption of correctness to the interpretation of the LEAA.

15. See 114 Cong.Rec. 12824, May 10, 1968 (remarks of Senator Hruska).

16. Congressman Cellar, chairman of the committee that drafted the House version of § 3766(a), declared that this section should "dispel * * * any qualms about this bill having any tendency to set up a Federal police force * * *." 113 Cong.Rec. 21,083, August 2, 1968. Other Representatives articulated the same concern to which Congressman Cellar was responding. For example, Representative Hutchinson remarked, "I do not believe the American people want a federal policeman patrolling their streets." 113 Cong.Rec. 21,188, August 3, 1967. See also Sen. Rep't No. 90–1097, 90th Cong., 2d Sess., at 227 (1968).

proposed plan or grant, would not remotely approach the apprehended "control over any police force or other law enforcement agency." The instant case presents a prime example. The decision as to the location of the proposed Center is far removed from the everyday activities of state and local police in Virginia. Moreover, it is a decision which, once made, would not invite continued supervision and control by the LEAA. This could not conceivably constitute a step towards the establishment of a "federal police force." The object of the "hands off" policy in the Safe Streets Act would not be frustrated by LEAA's compliance with NHPA and NEPA.[17]

We are bolstered in this conclusion by the LEAA's practice of coordinating with other federal legislation. It has faithfully observed the common-sense duty, in the absence of irreconcilable conflict, to dovetail its statute with others. To this end, the LEAA's own "Guide for Comprehensive Law Enforcement"[18] requires that, in each state comprehensive plan,

> Separate subsections * * * set forth plan relationships with and procedures established to effect coordination with plans under
>
> (a) the Juvenile Delinquency Prevention and Control Act of 1968
>
> (b) the Model Cities Program under the Demonstration Cities and

Metropolitan Development Act of 1966

(c) the Highway Safety Act of 196[6].[19]

In addition, these guidelines require the states, their subgrantees and contractors to comply with the Civil Rights Act of 1964 and the Justice Department's regulations thereunder.[20]

Given this list of statutes recognized by the LEAA, none of which find explicit expression in the Safe Streets Act, it is anomalous for the LEAA to argue now that there is no room at the inn for NHPA and NEPA. Following the procedural requirements of these two acts would intrude less into state and local affairs than the above-mentioned statutes. Nor, in light of LEAA's considerable existing coordination with other statutes do we see how compliance with NHPA and NEPA will undercut the sought-after efficiency to be found in state planning and control.

■ Concluding, as we do, that the "hands off" character of the Safe Streets Act is not as sweeping as the LEAA contends, it follows that NHPA, with its unequivocal command to "any federal agency," must be complied with by the LEAA.[21]

We conclude further that NEPA, no less than NHPA, must be followed here.[22]

17. Counsel for appellee Brown stated in oral argument that if federal funds for the Center were not forthcoming, Virginia would build the Center without them. While it might be said that this would frustrate the purposes of NHPA and NEPA, such a result would be the product of the congressional decision to have these two statutes apply only to federal agencies. In any case, Virginia's unwillingness to comply with NHPA and NEPA would still not provide the LEAA an escape from its obligations.

18. LEAA, Guide for Comprehensive Law Enforcement, January, 1970.

19. *Id.* at 59.

20. *Id.* at 39. See 28 C.F.R. Part 42 for the applicable Justice Department regulations.

Failure to comply with the regulations of the LEAA can result in the termination of grant fund payments. 42 U.S.C. § 3757.

21. 16 U.S.C. § 470f. The mandatory character of NHPA, as found by the District Court, is not disputed by any of the parties in this appeal.

22. We are aware that NEPA requires the preparation of an environmental impact statement only in connection with a "major federal action." 42 U.S.C. § 4332 (2) (C). The LEAA has intimated that, since federal involvement in the proposed Center extends only to providing twenty percent of the construction costs, there is no "major federal action."

Even assuming that this degree of federal financial involvement would not

The LEAA misconstrues the import of the language "to the fullest extent possible," found in NEPA. The quoted language does not render the procedural requirements of NEPA "discretionary." Rather, the words are an injunction to all federal agencies to exert utmost efforts to apply NEPA to their own operations. In short, the phrase "to the fullest extent possible" reinforces rather than dilutes the strength of the prescribed obligations.

Judge J. Skelly Wright has recently written an exhaustive and convincing opinion in Calvert Cliffs' Coordinating Committee v. United States Atomic Energy Commission, 449 F.2d 1109 (D.C. Cir. July 23, 1971), concerning, in part, the strength of the mandate of NEPA. Although *Calvert Cliffs* did not deal with the Safe Streets Act, what Judge Wright said in construing the NEPA language "to the fullest extent possible," is nonetheless highly pertinent to our case. Judge Wright said:

> We must stress as forcefully as possible that this language does not provide an escape hatch for footdragging agencies; it does not make NEPA's procedural requirements somehow "discretionary." Congress did not intend the Act to be such a paper tiger. Indeed, the requirement of environmental consideration "to the fullest extent possible" sets a high standard for the agencies, a standard which must be rigorously enforced by the reviewing courts. (449 F.2d at 1114.)

In holding that NHPA and NEPA apply to block grants under the Safe Streets Act, we do not adopt the appellees' argument that the proposed Medical and Reception Center, with its tall, concrete-faced buildings, its fence and its tower, could not possibly present a jarring contrast to the existing architecture and atmosphere in Green Springs. Neither do we endorse the appellants' allega-

tions that "[building] the penal facility on the Green Springs site will destroy the unique historical and architectural environment of that area." The merits of the respective contentions are not the issue before us. Indeed, the very purpose of NHPA and NEPA was to place consideration of such issues in a federal administrative forum. It may be that, after observing the procedural requirements of NHPA and NEPA and considering the environmental and cultural factors as required by those two Acts, the LEAA will conclude that the appellants' fears are unfounded or that weighing the apprehended damages and dangers from the Center against other relevant considerations, the plans should be allowed to proceed. Or, the LEAA, after consulting Virginia authorities, may deem a modification of the plans desirable and feasible. We go no further than to direct the District Court to order the LEAA to proceed in the spirit instructively expounded by Judge Wright in *Calvert Cliffs.*

█ If the LEAA, after following the precepts of NHPA and NEPA, makes a good faith judgment as to the consequences, courts have no further role to play. We note, however, that a federal agency obligated to take into account the values NHPA and NEPA seek to safeguard, may not evade that obligation by keeping its thought processes under wraps. Discretion to decide does not include a right to act perfunctorily or arbitrarily. That is the antithesis of discretion. The agency must not only observe the prescribed procedural requirements and actually take account of the factors specified, but it must also make a sufficiently detailed disclosure so that in the event of a later challenge to the agency's procedure, the courts will not be left to guess whether the requirements of NHPA and NEPA have been obeyed.

qualify as a major federal action, we think that, in view of the LEAA's overall involvement in the promotion and planning of the Center, as well as the cumulative impact of the proposed fed-

eral action, the NEPA definition of "major federal action" has been satisfied. *See* CEQ Guidelines, § 5(b), 36 Fed.Reg. 7724 (1971).

With regard to NEPA, the statutory requirement of a "detailed statement * * * on the environmental impact of the proposed action" places a heavy burden on the LEAA. To enable a court to ascertain whether there has been a genuine, not a perfunctory, compliance with NEPA, the LEAA will be required to explicate fully its course of inquiry, its analysis and its reasoning.

### IV

■ We turn now to the case against appellee Brown, as Director of the Department of Welfare and Institutions for the State of Virginia. Appellants contend first that, under 42 U.S.C. § 1983, they are entitled to an injunction against the placement of the Center in Green Springs because Brown's failure to consider the environmental and cultural impact of the proposed Center violated their statutory rights under NHPA and NEPA. The short answer to this contention is that NHPA and NEPA, by their very language, impose no duties on the states and operate only upon federal agencies.

■ An ancillary argument of the complaining parties, not vigorously pressed, is that apart from NHPA and NEPA, the federal Constitution was violated by Brown's "unreasonable and arbitrary action" in placing the proposed Center in Green Springs. We decline the invitation to elevate to a constitutional level the concerns voiced by the appellants. While a growing number of commentators argue in support of a constitutional protection for the environment,[23]

this newly-advanced constitutional doctrine has not yet been accorded judicial sanction; and appellants do not present a convincing case for doing so.

Appellants baldly attempt to stretch rights, protected by law against infringement by federal agencies only, to cover the states and their officers in disregard of the plainly limited character of the legislation. They make their assertion without citation of a single relevant authority and with no attempt to develop supporting reasons. The general concept of conservation and protection of the environment has, in the recent past, made vast advances, prompting the adoption of NHPA, NEPA and other legislation. But without any showing whatever, we are not free to lay upon the State of Virginia new obligations on constitutional grounds.

Neither the statutes nor the Constitution confers rights on the appellants which are enforceable *vis-a-vis* the State of Virginia under 42 U.S.C. § 1983.

### V

To summarize, we hold that the LEAA is duty-bound, in approving the grant at issue here, to comply with the procedural requirements of NHPA and NEPA. We reverse the judgment as to appellees Velde and Coster and we remand for the entry of an appropriate order in accord with this opinion.

However, for the reasons stated above, the denial of an injunction against appellee Brown is affirmed.

Affirmed in part, reversed in part, and remanded.

23. *E. g.*, Sive, Some Thoughts of an Environmental Lawyer in the Wilderness of Administrative Law, 70 Colum.L.Rev. 612, 642–43 (1970); Roberts, The Right to a Decent Environment, 55 Cornell L. Rev. 674, 688–92 (1970); Note, Toward a Constitutionally Protected Environment, 46 Va.L.Rev. 458 (1970).