Lewis Earl MILLER, Don Scoggins, and the Wilder Cemetery Association, Plaintiffs,

v.

The UNITED STATES and Colonel Dale K. Randels, District Engineer, Little Rock District, Corps of Engineers, Defendants.

No. LR–C–80–257.

United States District Court, E. D. Arkansas, W. D.

July 2, 1980.

Edward Allen Gordon, Morrilton, Ark., H. Clay Robinson, Fort Smith, Ark., for plaintiffs.

Markham Lester, Asst. U. S. Atty., R. E. Rogers, Jr., Little Rock, Ark., for defendants.

## OPINION AND ORDER

HENRY WOODS, District Judge.

This case arises out of the proposed construction of a reservoir designed to provide the City of Conway, Arkansas with an adequate water supply. The plaintiffs are property owners whose land would be affected by the impoundment, and the defendant is the Army Corps of Engineers, the organization responsible for the selection of the site and the preparation of the Environmental Impact Statement. The case was first heard on the plaintiffs' motion for a preliminary injunction. The court denied the injunction, and, after a second hearing, we are now in a position to review the case on the merits.

### I. FACTS

In 1974 Congress authorized the construction of a new water supply facility for the City of Conway in Faulkner County, Arkansas. The city's original source of water was damaged when the McClellan-Kerr Arkansas River Navigation System raised the level of the Arkansas River, an act which resulted in the contamination of the Conway Water System. Accordingly Congress ordered "the alteration at Federal Expense of the municipal water supply facilities of the City of Conway, Arkansas, by the construction of water supply impoundment facilities at a location outside the flat flood plain of Cadron Creek, together with interconnecting pipeline and other appurtenant works, so that the water supply capacity of the resultant facilities is approximately equivalent to that existing prior to the construction of the navigation system."

In response to the Congressional directive, the Corps began a study of various sites which might adequately accommodate the replacement system. Initially, a site at mile 2.6 on Cypress Creek was selected and a draft environmental impact statement was prepared. However, after public hearings were held, a less expensive site which would produce higher quality water was chosen. This site was located on mile 6.7 on Cypress Creek, and in conjunction with this

selection a final Environmental Impact Statement was compiled. It is both the procedural and substantive inadequacy of this statement that is being challenged by the plaintiffs.

The final EIS is in large part devoted to a study of the environmental impacts which would be the result of the proposed impoundment. Cypress Creek lies northwest of Conway in Conway County, Arkansas. It is part of the Cypress Creek Drainage Basin which is in turn a smaller part of the Arkansas River Drainage Basin. The Cypress Creek Drainage Basin is bounded on the south by Cadron Ridge. That portion of the City of Conway lying to the south of Cadron Ridge is in the Palarm Creek Drainage Basin. The proposed impoundment will create a lake capable of supplying 16.75 million gallons of water per day; this is roughly equivalent to the amount provided by Conway's existing system. The creation of the lake would result in the inundation of approximately 1,165 acres. An additional 1,291 acres would be acquired as mitigation lands. The lake would supply Conway with water of a significantly higher quality than that produced by the existing system. The impoundment will obviously have an effect on the area's plant, fish and animal resources. Accordingly the EIS provides for the purchase of mitigation acreage which would be developed by the Corps but would ultimately be managed by the Arkansas Game and Fish Commission. Although public access to the area will be limited, the plan does provide for two access areas to the reservoir and one to the tailwater, each of which would be accompanied by adequate parking space. The lake itself is capable of supporting approximately 35,000 man-days of fishing and 300 man-days of waterfowl hunting. In March of 1979 the Fish and Wildlife Service approved the mitigation plan and the provisions for public access to the reservoir and mitigation area.

In addition to the impact on the area's natural resources, the impoundment will have cultural and socio-economic effects. Nineteen families, a business and a cemetery lot will have to be relocated; 623 acres of prime farmland will be inundated, 10 archeological sites will be lost, and eight historic sites will be destroyed. Studies are presently under way to determine the significance of the archeological and historic sites. If any of the sites are determined by the state to be significant, a plan of mitigation will be developed and coordinated with the Arkansas State Historic Preservation Officer, the State Archeologist and the Advisory Council on Historic Preservation. Until such a determination is made, the sites will be treated as though they were significant. The total cost for the construction of the reservoir and the plans outlined in the EIS is $23,100,000.00, and the annual operation and maintenance cost is estimated to be $103,000.00.

The remainder of the EIS is devoted to a discussion of the alternative sites which were studied as a part of the final selection process. Of the five sites under consideration only one is seriously in issue in this case. According to alternative number I, a dam would be constructed on the East Fork of Point Remove Creek. This site is nine miles north of Morrilton in Conway County, Arkansas. The dam would create a 1,000-acre lake and would require the total purchase of approximately 2,058 acres. Of all the sites studied, including the Cypress Creek site, this one would produce the highest quality water. Additionally the EIS contains letters from an engineering firm and from concerned citizens indicating that the Point Remove site has the potential for supplying water on a regional basis and that it would not only meet the needs of the City of Conway but also would serve as a source of water for Conway County. The East Fork Point Remove site was selected by the Conway County Rural Development Authority as the source for future water supply, and the Conway County Regional Water Distribution District has been formed to locate a superior source of water for the area within the district. Finally a joint venture study funded in part by the Arkansas Soil and Water Conservation Commission has been undertaken to identify a source of water for Pope, Conway and parts of Yell Counties. The EIS describes this study as follows:

As part of this study a review of all alternative solutions for a regional water supply source will be considered, including Greers Ferry Lake, the proposed reservoir for the City of Conway, a new reservoir to serve Conway County, or one large regional facility to serve the entire study area. This study is anticipated to be completed in June of 1979, and funds for preliminary subsurface investigations of the recommended sites will be requested from the Soil and Water Conservation Commission later this year.

The EIS then includes the following analysis of these various projects:

The three above projects concerned with municipal and industrial water supply are not implementable alternatives for the Conway Water Supply relocation as the terms of the authorization law are relatively explicit (see paragraph 1.01) as to the capacity of the supply. Accordingly, there could be two more small water supply lakes built in the general area; however, the timing and probability of their construction is currently unknown.

With regard to the environmental impact of the impoundment on Point Remove Creek the EIS states that the impact on wildlife would be substantially the same as that which will occur on the Cypress Creek site. However, the archeological and socio-economic impacts will be substantially less. There are no archeological sites within the area and only three families and four farms would be displaced. Furthermore the effect on agriculture would not be as great as the effect on the chosen site, as most of the land surrounding the creek is pasture or woodland. The estimated cost of constructing a dam at Point Remove Creek is $37,-212,000.00 with an annual operation and maintenance cost of $157,400.00. In arriving at the cost of the Point Remove Dam, the higher delivery capacity of that impoundment was not considered. Despite the environmental evaluation the Corps rejected the Point Remove Site. In the draft EIS it was stated: "The East Fork Point Remove Creek site is about 9 miles north of Morrilton. The water quality at this site would be the best of any of the sites considered. The higher costs of construction, which includes the pipeline, and a State law prohibiting the interbasin transfer of water make this site less desirable." This statement was further elaborated upon in the final EIS:

This alternative would probably furnish water of higher quality than any of the other sites considered. The environmental impacts of this site are slightly different from the selected site in degree due to the size of the impoundment, but in general, the impacts are very similar. Adverse social impacts of this site are not nearly so prevalent as for Site 2, Cypress Creek. Only 3 families and 4 farms would be displaced, with no public institutions involved. This alternative would also impact agricultural activity the least of the five alternatives. The site was not considered further because of the higher initial cost compared to the selected site, and the State Water Plan which states that, "Under Arkansas Case Law there can be no interbasin transfer of water without payment of damages nor without complying with the law of eminent domain where applicable." (Page 174, *Arkansas State Water Plan*, Main Report, Department of Commerce, Division of Soil and Water Resources, October 1975.)

The plaintiffs' one witness, a civil engineer testified that Point Remove Creek had a better potential for regional water supply than the Cypress Creek site, and that, while the capitalized annual cost of Point Remove was higher, that estimated cost failed to take into consideration the higher yield of Point Remove. He further stated that various funds were available for the construction of a regional water supply and that the construction of a reservoir at Cypress Creek would make the funding of a regional water system more difficult.

Testimony by representatives of the Corps paralleled the conclusions found in the EIS. It was stated that a regional water supply system was not considered because Congressional authorization specifically limited the project to the replacement

of Conway's existing system, and that the Point Remove site was eliminated because of the high initial cost. With regard to Arkansas interbasin transfer law, the court was told that the Corps did no independent legal research to determine the accuracy of the conclusion but rather relied solely on the advice of the representatives of the State of Arkansas.

## II. DISCUSSION

The purpose of the National Environmental Policy Act of 1969 (NEPA) is to insure that all Federal agencies give appropriate consideration to environmental values. Both the procedural and the substantive requirements of the act were thoroughly discussed in *Calvert Cliff's Coordinating Committee v. United States Atomic Energy Commission*, 449 F.2d 1109 (D.C.Cir. 1971). There the court said:

> Section 101 sets forth the Act's basic substantive policy: that the federal government "use all practicable means and measures" to protect environmental values. Congress did not establish environmental protection as an exclusive goal; rather, it desired a reordering of priorities, so that environmental costs and benefits will assume their proper place along with other considerations. In Section 101(b), imposing an explicit duty on federal officials, the Act provides that "it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy," to avoid environmental degradation, preserve "historic, cultural, and natural" resources, and promote "the widest range of beneficial uses of the environment without * * * undesirable and unintended consequences."
>
> Thus the general substantive policy of the Act is a flexible one. It leaves room for a responsible exercise of discretion and may not require particular substantive results in particular problematic instances. However, the Act also contains very important "procedural" provisions—provisions which are designed to see that all

federal agencies do in fact exercise the substantive discretion given them. These provisions are not highly flexible. Indeed, they establish a strict standard of compliance. . . .

> The sort of consideration of environmental values which NEPA compels is clarified in Section 102(2) (A) and (B). In general, all agencies must use a "systematic, interdisciplinary approach" to environmental planning and evaluation "in decisionmaking which may have an impact on man's environment." In order to include all environmental factors in the decisional equation, agencies must "identify and develop methods and procedures * * * which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations." "Environmental amenities" will often be in conflict with "economic and technical considerations." To "consider" the former "along with" the latter must involve a balancing process. In some instances environmental costs may outweigh economic and technical benefits and in other instances they may not. But NEPA mandates a rather finely tuned and "systematic" balancing analysis in each instance.
>
> To ensure that the balancing analysis is carried out and given full effect, Section 102(2) (C) requires that responsible officials of all agencies prepare a "detailed statement" covering the impact of particular actions on the environment, the environmental costs which might be avoided, and alternative measures which might alter the cost-benefit equation. The apparent purpose of the "detailed statement" is to aid in the agencies' own decisionmaking process and to advise other interested agencies and the public of the environmental consequences of planned federal action. Beyond the "detailed statement," Section 102(2) (D) requires all agencies specifically to "study, develop, and describe appropriate alternatives to recommend course of action in any proposal which involves unresolved conflicts con-

cerning alternative uses of available resources." This requirement, like the "detailed statement" requirement, seeks to ensure that each agency decisionmaker has before him and takes into proper account all possible approaches to a particular project (including total abandonment of the project) which would alter the environmental impact and the cost-benefit balance. Only in that fashion is it likely that the most intelligent, optimally beneficial decision will ultimately be made. Moreover, by compelling a formal "detailed statement" and a description of alternatives, NEPA provides evidence that the mandated decisionmaking process has in fact taken place and, most importantly, allows those removed from the initial process to evaluate and balance the factors on their own. . . .

Thus the Section 102 duties are not inherently flexible. They must be complied with to the fullest extent, unless there is a clear conflict of *statutory* authority. Considerations of administrative difficulty, delay or economic cost will not suffice to strip the section of its fundamental importance.

We conclude, then, that Section 102 of NEPA mandates a particular sort of careful and informed decisionmaking process and creates judicially enforceable duties. The reviewing courts probably cannot reverse a substantive decision on its merits, under Section 101, unless it be shown that the actual balance of costs and benefits that was struck was arbitrary or clearly gave insufficient weight to environmental values. But if the decision was reached procedurally without individualized consideration and balancing of environmental factors—conducted fully and in good faith—it is the responsibility of the courts to reverse. As one District Court has said of Section 102 requirements: "It is hard to imagine a clearer or stronger mandate to the Courts." (At 1112–15.)

██ One of the most important procedural requirements of the Act is contained in those sections which discuss the development of alternative actions. These sections require that the responsible official submit a detailed statement of the alternatives and that the agency "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(C)(iii), (E). The Eighth Circuit in *Environmental Defense Fund v. Froehlke*, 473 F.2d 346 (8th Cir. 1972) held that all reasonable alternatives to the proposed project should be studied and developed in order that "agency officials will be acquainted with the tradeoffs which will have to be made if any particular line of action is chosen." At 351. In that opinion the court also stated:

> The complete impact statement must contain more than a catalog of environmental facts, however. The agency must also "explicate fully its course of inquiry, its analysis and its reasoning." *Ely v. Velde*, 451 F.2d 1130, 1139 (4th Cir. 1971). Thus, the complete formal impact statement represents an *accessible* means for opening up the agency decision-making process and subjecting it to critical evaluation by those outside the agency, including the public. (At 351.)

Accepting these general rules of construction, we now turn to an analysis of the specific arguments advanced by the plaintiffs.

██ a. The plaintiffs in section five of their complaint argue that the Corps has failed to comply with suggestions for mitigation made by the Fish and Wildlife Service. This argument is not supported by the statements contained in the EIS nor is it supported by the letter from the Fish and Wildlife Service to the Corps which appears in the appendix to the EIS. In March of 1979 the Corps was informed that the mitigation plan would adequately protect the Fish and Wildlife in the area. Specifically addressing the question of public access to the reservoir and surrounding lands the Service stated:

> The Service is pleased to note that our recommendations concerning continuous

downstream releases, public access to the reservoir and tailwater area, and reservoir clearing have all been included in project plans.

The Service also recommended public access to the stream below the dam through acquisition of a greenbelt or flood easement. The Corps has advised that fee purchase of a greenbelt to provide public access to the entire stream below the dam is felt to be unwarranted due to resulting severe social disruptions such as severance of ownerships and encouragement of trespass. However, the revised plan of land acquisition includes an additional 240 acres downstream from the dam which will provide public access for about three-fourths mile of stream.

In view of the foregoing, the Fish and Wildlife Service is of the opinion that the Conway Water Supply project, as now proposed, contains features which will satisfactorily protect fish and wildlife resource values for the life of the project.

From this letter and from the EIS itself, it can be seen that the Service recommendations concerning mitigation and public access were both studied and adopted by the Corps in its final analysis and selection of the site. We therefore conclude that the proposed mitigation plan is both procedurally and substantively adequate.

■ b. The plaintiffs' next argument poses a more difficult question than that raised by the Corps' mitigation plan. It is the plaintiffs' position that the EIS is procedurally defective because it does not study and develop the alternative of a regional water supply system which would presumably be located at Point Remove Creek. The court in *Natural Resources Defense Council v. Morton*, 458 F.2d 827 (D.C. Cir. 1972) specifically addressed the problem of defining the range of alternatives that need be considered within the context of the EIS. In that case the Secretary of Interior had announced the sale of oil and gas leases on the Outer Continental Shelf and had prepared an EIS in conjunction with the project. The statement was challenged on the grounds that it failed to develop alternatives such as the elimination of oil import quotas. The court rejected the defendant's contention that ". . . the only alternatives required for discussion under NEPA are those which can be adopted and put into effect by the official or agency issuing the statement." At 834. Rather, the court ruled: "The scope of this project is far broader than that of other proposed Federal actions discussed in impact statements, such as a single canal or dam. . . When the proposed action is an integral part of a coordinated plan to deal with a broad problem, the range of alternatives that must be evaluated is broadened." At 835. Further on in the opinion a more detailed explanation of this approach was given:

> The mere fact that an alternative requires legislative implementation does not automatically establish it as beyond the domain of what is required for discussion, particularly since NEPA was intended to provide a basis for consideration and choice by the decision-makers in the legislative as well as the executive branch. But the need for an overhaul of basic legislation certainly bears on the requirements of the Act. We do not suppose Congress intended an agency to devote itself to extended discussion of the environmental impact of alternatives so remote from reality as to depend on say, the repeal of the antitrust laws. (At 837.)

While in *Environmental Defense Fund v. Morton, supra* the overall project was the reconciliation of energy demands with and environmental consequences associated with satisfying those demands, the court in *Environmental Defense Fund v. Armstrong*, 356 F.Supp. 131 (N.D.Cal. 1973) was concerned with the range of alternatives that should reasonably be studied in connection with the construction of the New Mellones Dam. There the plaintiffs argued that the EIS was inadequate because it failed to discuss possible alternative sources of supply, and they urged the court to require a "comprehensive study of the Central Valley Project be made, viewing the system of state and

federal water projects as an integrated unit." At 139. While the court agreed with the wisdom of undertaking such a study, it concluded:

So long as each major federal action is undertaken individually and not as an indivisible, integral part of an integrated state-wide system, then the requirements of NEPA are determined on an individual major federal action basis. Plaintiffs' suggestion that there is need for a comprehensive study of the Central Valley Project should be made to the Congress, and not to the Court. (At 139.)

See also *Jicarilla Apache Tribe of Indians v. Morton*, 471 F.2d 1275 (9th Cir. 1973).

Applying these statements to the case now before the court, it can be seen that the EIS must address itself to a range of environmental alternatives which will broaden according to the scope of the project. Here the Corps was specifically authorized by the Congress to develop a water supply for the City of Conway, a supply which would be approximately equivalent to the system damaged by the Arkansas River Navigation System. Within this context the purpose of the EIS is to study and develop alternatives which would satisfy approximately the same needs as the chosen site and to disclose the environmental impacts of those sites so that a reasoned environmental choice may be made. When Congress authorized the project it in no way suggested that the Corps should solve the regional water problem or select a site for the Conway system based upon the needs of the region. Accordingly the Corps studied the Point Remove site from the perspective of locating an alternative site for Conway, not a site for a regional water supply system. The question of whether or not Point Remove should have been selected or studied as a location for a regional system is in essence a question that addressed itself to the merits of Congress's decision to construct a water supply system for the City of Conway. A consideration of the merits of such a project is not within the purview of the EIS, nor is it within the purview of this court. It may well be that Conway and Faulkner Counties would be best served by one water system, however, this is a question that Congress, not the courts, has the authority to solve. To require the Corps to develop plans for a regional system as part of the EIS would lead to an unending consideration of alternatives none of which would be based upon the need for environmental disclosure. Were a regional supply system to be considered an alternative to this project it can be seen that NEPA would demand that alternatives to the Point Remove alternative be studied and developed. Where the project authorization is as narrow as is in this case the EIS need only review the environmental impacts of sites which serve the purpose defined in the authorization. The statement need not develop an alternative which is essentially an entirely different project. Arguments which address the need for the project rather than the project's environmental consequences should be made to Congress. Accordingly we hold that the EIS is not inadequate for its failure to study Point Remove Creek as a source of water for an entire region.

■ c. The plaintiffs also argue that the Corps' rejection of the Point Remove Creek site was arbitrary and capricious in that it failed to consider environmental factors in determining the cost of the project and in that it relied on an erroneous statement of Arkansas law in concluding that the interbasin transfer of water was prohibited. Since we find that this section of the statement is procedurally deficient, we need not decide the question of whether the decision to proceed with construction at Cypress Creek was arbitrary and capricious.

With regard to the procedural adequacy of any environmental analysis made pursuant to the provisions of NEPA, it has been said:

We note, however, that a federal agency obligated to take into account the values NHPA and NEPA seek to safeguard, may not evade that obligation by keeping its thought processes under wraps. Discretion to decide does not include a right to act perfunctorily or arbitrarily. That

is the antithesis of discretion. The agency must not only observe the prescribed procedural requirements and actually take account of the factors specified, but it must also make a sufficiently detailed disclosure so that in the event of a later challenge to the agency's procedure, the courts will not be left to guess whether the requirements of NHPA and NEPA have been obeyed. *Ely v. Velde*, 451 F.2d 1130 (4th Cir. 1971); *Environmental Defense Fund v. Froehlke*, 473 F.2d 346 (8th Cir. 1972).

Furthermore, other courts have warned of the dangers inherent in accepting the statements of local agencies for inclusion in the EIS without requiring the responsible Federal Agency to make an independent determination of their accuracy. In *Trinity Episcopal School Corp. v. Romney*, 523 F.2d 88 (2d Cir. 1975) the court said:

. . . we noted the danger of accepting without question the self-serving statements or assumptions of local agencies in connection with the preparation of EIS's. This danger is equally apparent where an agency like HUD accepts an unsupported statement as to lack of any alternatives from "interested" local agencies. Furthermore in the context of legislation that requires federal agencies to affirmatively develop a reviewable environmental record, even where the agency determines that an EIS is not required, a perfunctory and conclusory statement that there are no alternatives does not meet the agency's statutory obligation. (At 94.)

The Corps in both the draft EIS and the final report justified the rejection of the Point Remove site on the grounds that the initial cost was prohibitive and on the grounds that according to Arkansas law the interbasin transfer of water was impermissible without a taking by eminent domain or without the payment of damages. While cost alone may be a permissible reason for rejecting the Point Remove site, the Corps must give its reasons for the determination that the cost outweighed the environmental benefits. The conclusory statement that the site was rejected because of cost does not reveal enough of the agency's thought processes to allow us to determine whether environmental factors were properly considered.

The statement concerning Arkansas law is deficient for similar reasons. It is a conclusion that is not supported by the agency's reasoning or by any facts. Arkansas water law is thoroughly discussed by the Arkansas Supreme Court in *Harrell v. City of Conway*, 224 Ark. 100, 271 S.W.2d 924 (1954). In that case the City of Conway constructed an impoundment on Cadron Creek, which like Cypress Creek is north of Cadron Ridge and the City of Conway. The city was a riparian owner since it had purchased twenty acres of land on both sides of the river. The trial court held that the city had the right to take and use the water in the impoundment. The Supreme Court disagreed and in doing so gave the following explanation:

On the question of riparian rights of a borough which had acquired a 10 acre tract of land on a stream some distance from the borough, on which it constructed a reservoir for a supply of water to its inhabitants, the court, in *Haupt's Appeal*, 1889, 125 Pa. 211, 17 A. 436, 437, 3 L.R.A. 536, said: "If the authority of the plaintiff (the borough) were measured by its rights as riparian owner, it would be slender enough. It might, indeed, use the water for the domestic purposes incident to the said 10 acres of land. If there were a tenant thereon he could use it for watering his stock, and for household purposes; for any useful, necessary, and proper purpose incident to the land itself, and essential to its enjoyment. But that the rights of a riparian owner would justify the plaintiff in carrying the water for miles out of its channel to supply the Borough of Ashland with water, is a proposition so palpably erroneous that it would be a waste of time to discuss it", and in *Wallace v. City of Winfield*, 1915, 96 Kan. 35, 149 P. 693, the court held (Headnote 3): "A city which purchases land abutting on a stream acquires the right of a riparian owner, which is the

reasonable use of water for domestic and other ordinary purposes incident to the land; but it does not thereby acquire the right to divert or take water from the stream for the purpose of selling it to the inhabitants of the city without making compensation to those who are thereby deprived of water rights."

The City of Conway, as plaintiff, is not asserting what would be regarded as riparian rights under either theory. It seeks to take the water beyond the limits of the watershed and sell it commercially. Since that particular use of the water would not be permitted under either theory, the City is not in a position to assert any cause of action against the appellants.

According to this statement the city as a riparian owner might only use the water from the stream in connection with the riparian land. It could not take the water outside the stream's watershed and sell it to the inhabitants of another watershed. The court, however, goes on to say that this theory of water use does not apply until there is a shortage of water:

> Until there is insufficient water to serve the needs of each and all of the riparian owners, on the creek, their relative rights are not in question, for while the supply is plentiful (as it appears for more than 90% of the time) no need arises to apportion the water. When however, a shortage is present, then the law, as indicated, of riparian rights comes into play and must apply. (271 S.W.2d at 927)

It therefore can be concluded that an interbasin transfer of water can take place when a surplus of water exists. Absent such a surplus the water may not be removed from watershed. This statement of the law is particularly confusing as applied to this case. We do not know if the City of Conway is a riparian owner of Cypress Creek or if the land was taken by eminent domain. Furthermore, if the interbasin transfer from Point Remove to the City of Conway is illegal it would also seem that the transfer from the chosen site to the City of Conway is prohibited. It may be that there is a surplus of water in the Cypress Creek Drainage Basin which would foreclose the application of riparian rights, however, in rejecting Point Remove on the basis of Arkansas law such a determination should also be made concerning that site. In summary, the Corps must explain and apply Arkansas law to the facts as they exist in this case. A conclusory statement of the law unaccompanied by a factual analysis does not give us a statement sufficient to allow review of the Corps' reasoning processes. The court therefore finds that the section of the EIS dealing with the rejection of the Point Remove site is incomplete.

## ORDER

The Corps is hereby ordered to file a supplemental statement in accordance with this opinion. If such a statement is not presented to the court within 60 days of the date of this order, the plaintiffs may apply for further relief.