# Applicability of Certain Cross-Cutting Statutes to Block Grants Under the Omnibus Budget Reconciliation Act of 1981

Two block grant programs created by the Omnibus Reconciliation Act of 1981 are subject to four "cross-cutting" statutes barring discrimination on grounds of race, sex, handicap, and age, and activities funded under those programs are subject to all of the regulatory and paperwork requirements imposed by those statutes.

The language and legislative history of the four nondiscrimination laws at issue reveal that they were intended by Congress to be statements of national policy broadly applicable to all programs or activities receiving federal financial assistance. Therefore, in the absence of a clear expression of congressional intent to exempt a particular program from the obligations imposed by the four cross-cutting laws, those laws will be presumed to apply in full force

While the general purpose of the block grant concept is to consolidate and "defederalize" prior categorical aid to state and local governments, and to lighten federal regulatory burdens, there is no suggestion in the legislative history of the two specific block grants at issue here that Congress intended to exempt programs or activities funded by them from the obligation not to discriminate embodied in the four cross-cutting statutes.

January 18, 1982

MEMORANDUM OPINION FOR THE COUNSEL TO THE DIRECTOR, OFFICE OF MANAGEMENT AND BUDGET

## I. Introduction

This responds to your request for our opinion concerning the applicability of four "cross-cutting"[1] laws to two specific block grant programs created by the Omnibus Budget Reconciliation Act of 1981, Pub. L. No. 97-35, 95 Stat. 357 [the Reconciliation Act]. Although numerous cross-cutting laws are potentially applicable to the several block grants created by the Reconciliation Act, you have inquired specifically about the applicability of four nondiscrimination statutes to two block grants administered by the Departments of Health and Human Services (HHS) and Education, respectively. These four nondiscrimination statutes are:

(1) Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d;

---

[1] The use of the term "cross-cutting" refers to the broad applicability of the particular statutes discussed herein to a wide range of programs or activities receiving federal financial assistance. Because our analysis relies heavily on the legislative history of these four statutes and the public policy reflected in them, our conclusions may not necessarily apply to other cross-cutting statutes.

83

(2) Title IX of the Education Amendments Act of 1975, 20 U.S.C. § 1681;

(3) Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; and

(4) The Age Discrimination Act of 1975, 42 U.S.C. §§ 6101–6107.

The two relevant block grants are the Social Services Block Grant and the Elementary and Secondary Education Block Grant.

These two block grants were enacted as part of the massive Omnibus Budget Reconciliation Act of 1981, an unusual statute for its length, breadth, and relatively swift enactment. The legislative breadth of the Reconciliation bill was such that some 30 committees in both Houses of Congress had jurisdiction over the bill. The Reconciliation bill adopted by the House, however, was not a product of the committees but rather was an alternative known as the Gramm-Latta amendment. The House considered the entire Reconciliation package in only two days of debate, and its vote occurred on the same day that the then 700-page Gramm-Latta amendment was made available for general distribution.[2]

The House and Senate bills required the "largest and most complicated conference in the history of the Congress." See 127 Cong. Rec. H5759 (daily ed. July 31, 1981) (Summary of Reconciliation Conference). In only a two-week period, 184 House conferees and 69 Senate conferees held a series of 58 "miniconferences." The Reconciliation Act that resulted is over 570 pages long, see 95 Stat. 357-933, and although it is primarily a "budget" act, it necessarily makes changes in substantive law in the numerous areas it addresses.[3]

The unique and complex nature of the legislation and its unprecedented legislative history are noted because they are relevant to our analysis of the Reconciliation Act and congressional intent with respect to the four cross-cutting statutes. Your memorandum expresses the preliminary view that the four non-discrimination statutes do not apply to the Social Services and the Elementary and Secondary Education Block Grants. This conclusion is based on several considerations: (1) the fundamental intent of Congress in enacting block grants was to free the states from all federal encumbrances and regulations not specifically imposed by the statutes; (2) as of the date of your memorandum, the block-grant regulations that had been issued by the agencies responsible for administering them were silent on applicability of the four nondiscrimination statutes to the two block grants in question; (3) six of the eight block grants applicable to the Departments of Education and Health and Human Services explicitly incorporate

---

[2] As a result of the dimensions of the legislation and its rapid movement through the legislative process, some opponents expressed strong criticism over the process as well as expressing considerable confusion over some aspects of the package See. e.g , 127 Cong. Rec H3917 (daily ed June 26, 1981) (remarks of Rep. Foglietta) ("I would not claim to know all that is in this volume of 700 pages, we only received shortly before noon today I have hardly had a chance to read it."), id H3920 (remarks of Rep. Panetta) ("We are dealing here with over 250 programs, and we are dealing with these changes in this amendment with no consideration, no committee hearings, no consultation, no debate, and no opportunity to offer amendments to this kind of broad substitute.") See also id. H3924 (remarks of Rep. Frenzel, supporting Gramm-Latta II) ("All of us have been embarrassed by the tardiness of the receipt of the amendment and by the untidiness of the process     I would invite each Member here     . to raise his or her sights above the indignity of a late, somewhat-flawed, hard-to-follow bill     ")

[3] The Reconciliation Act affected some 250 separate statutes. See 127 Cong. Rec S8988 (daily ed July 31, 1981) (remarks of Sen. Domenici)

84

nondiscrimination provisions, suggesting that the nondiscrimination require-
ments should not apply to the two block grants that omit them; (4) Congress itself
deleted nondiscrimination provisions from the original Administration pro-
posals; and (5) except for Section 504, nonapplicability of the nondiscrimination
provisions, which are largely redundant of constitutional or other statutory
protections or are of minimal effect, will reduce the regulatory and paperwork
aspects of enforcement of these rights without affecting to any significant extent
the substantive obligation not to discriminate.

The following additional views have also been expressed and we have consid-
ered them in our analysis:

> (1) The Secretary of Health and Human Services "interprets
> existing laws against discrimination in Federally assisted pro-
> grams as applying to the social services block grant." *See* Interim
> Final Rules for the Block Grant Programs, 46 Fed. Reg. 48,585
> (October 1, 1981) (to be codified in 45 C.F.R., Parts 16, 74, and
> 96). While your memorandum indicated that the draft HHS regu-
> lations did not purport to settle the issue, and that the regulations
> were silent on the question except for the above quoted "advisory
> statement," the Interim Final Rules since issued articulate the
> view that federal regulations related to discrimination on the basis
> of race, color, national origin, handicap, or age are applicable to
> the Social Services Block Grant.[4]

> (2) According to your memorandum, the legal staff of the Depart-
> ment of Education has expressed its view that "all cross-cutting
> statutes are applicable to the block grants." The Department of
> Education has not published regulations for the block grants.

> (3) The Civil Rights Division of the Department of Justice has
> forwarded to us a memorandum from Stewart Oneglia, Chief of
> the Coordination and Review Section, to Deputy Assistant At-
> torney General D'Agostino. This memorandum disagrees with
> the position taken in your memorandum, and expresses the legal
> conclusion that the nondiscrimination statutes apply to the two
> block grants.

---

[4] The HHS Interim Final Rules for the Block Grant Programs, 46 Fed Reg 48,585 (Oct 1, 1981), provide as
follows

> Current regulations in 45 C F.R Parts 80, 81, 84. and 90. which relate to discrimination on the
> basis of race, color, national origin, handicap, or age, apply by their terms to all recipients of Federal
> financial assistance and therefore apply to all block grants. In particular, 45 C.F.R 80 4 and 84.5
> require certain assurances to accompany applications for assistance In lieu of the assurances
> required by Parts 80 and 84, the Secretary will accept the assurances required by the Act to be part of
> the applications for the preventive health and health services, alcohol and drug abuse and mental
> health services, maternal and child health services, and low-income home energy assistance block
> grants Those assurances incorporate the nondiscrimination provisions pertinent to the block grants
> either specifically or as part of a general assurance that the applicant will comply with block grant
> requirements For the community services, primary care, and social services block grants, the States
> should furnish the assurances required by 45 C.F R. 80 4 and 84 5.

(4) You have provided us with a copy of a memorandum to you from Jim Kelly of the Office of Management and Budget regarding "Applicability of Crosscutting Policy Requirements to Block Grants." That memorandum recommends that Title VI, the Age Discrimination Act, and Section 504 should be considered to apply to all block grants, and that Title IX also should be considered to apply to the Education Block Grant. *See* note 5, *infra*.

For the reasons set forth in more detail below, we conclude that Congress evidenced no clear intent to exempt the programs or activities funded by the two block grants from the obligations imposed by the four nondiscrimination statutes.[5] In the absence of a clear indication of legislative intent to the contrary, we conclude that the block grant programs are subject to the nondiscrimination statutes.

## II. The Nondiscrimination Statutes

### A. Coverages and Purposes

All four of the relevant nondiscrimination statutes apply generally to programs or activities receiving "federal financial assistance." For example, Title VI, the earliest of these four nondiscrimination statutes, provides in broad terms:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under *any program or activity receiving Federal financial assistance.*

42 U.S.C. § 2000d (1976) (emphasis added). The other three nondiscrimination statutes contain similar prohibitions with respect to sex (in education programs),[6] age,[7] and handicapped status.[8] The reach of these later three statutes is somewhat narrower than that of Title VI as to the programs or activities covered[9] or the kind of discrimination prohibited.[10]

---

[5] Actual application of the nondiscrimination statutes to specific programs or activities may depend on individual circumstances. Since Title IX applies only to education programs, for example, its prohibition of sex discrimination may not apply to programs or activities funded by the Social Services Block Grant. This memorandum assesses only whether the nondiscrimination statutes as written and interpreted apply to the two block grants on the same basis as they would to other forms of federal financial assistance

[6] [N]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under *any education program or activity receiving Federal financial assistance* . .

20 U.S C § 1681(a) (1976) (emphasis added)

[7] [N]o person in the United States shall, on the basis of age, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under *any program or activity receiving Federal financial assistance*

42 U S.C. § 6102 (1976) (emphasis added)

[8] No otherwise qualified handicapped individual in the United States shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under *any program or activity receiving Federal financial assistance* .

29 U S.C.A. § 794 (1980 Supp. Pamph ) (emphasis added).

[9] Title IX applies only to certain education programs.

[10] The Age Discrimination Act prohibits only *"unreasonable* age discrimination " *See* H R Conf. Rep No 670. 94th Cong., 1st Sess 56 (1975) (emphasis in original). Section 504 applies only to "otherwise qualified" handicapped individuals. 29 U.S C. § 794

## (1) Title VI

The Civil Rights Act of 1964 was a comprehensive legislative program aimed at eradicating the "moral outrage of discrimination." *See* 110 Cong. Rec. 1521 (1964) (remarks of Rep. Celler). Title VI, as part of the 1964 Act, sought to achieve that goal by ensuring "once and for all that the financial resources of the Federal Government—the commonwealth of Negro and white alike—will no longer subsidize racial discrimination." *See* 110 Cong. Rec. 7054–55 (remarks of Sen. Pastore).[11] The requirement that federally assisted programs or activities be nondiscriminatory was based on Congress' power to fix the terms by which federal funds are made available, *see* 110 Cong. Rec. 7063 (1964) (remarks of Sen. Pastore), and the constitutional obligation not to discriminate. *See Regents of University of California* v. *Bakke*, 438 U.S. 265, 284 (1978); note 15, *infra*. Title VI also had roots in a "basic fairness" concept: black citizens should not be required to subsidize with their federal tax money programs or activities that discriminated against them. *See* 110 Cong. Rec. 7061 (remarks of Sen. Hart) ("we do not take money from everybody to build something, admission to which is denied to some").

Title VI represented a fundamental statement of national policy intended to apply across-the-board to all programs or activities receiving federal financial assistance. Senator Humphrey, the Senate manager of H.R. 7152, which was to become the Civil Rights Act of 1964, identified in his opening statement on the bill several needs for Title VI. He noted first that Title VI was necessary because some federal statutes actually appeared to contemplate grants to racially segregated institutions. Second, he noted that, although most federal agencies probably already had the authority to make nondiscrimination a condition of receipt of federal funds, "[e]nactment of Title VI will eliminate any conceivable doubts on this score and give express legislative support to the agency's actions. *It will place Congress squarely on record on a basic issue of national policy* on which Congress ought to be on record." Third, Title VI would "insure *uniformity and permanence* to the nondiscrimination policy." 110 Cong. Rec. 6544 (1964) (emphasis added). Finally, Senator Humphrey explained, enactment of Title VI would end the growing practice of having to debate nondiscrimination provisions each time a federal assistance program was before Congress:

> Many of us have argued that the issue of nondiscrimination should be handled in an overall, consistent way for all Federal programs, rather than piecemeal, and that it should be considered separately from the merits of particular programs of aid to education, health, and the like. This bill gives the Congress an opportunity to settle the issue of discrimination once and for all, in a uniform, across-

---

[11] *See also Cannon* v. *University of Chicago*, 441 U S. 677, 704 n 36 (1979), 110 Cong. Rec 7058 (remarks of Sen Pastore) ("From birth to death, in sickness and in want, in school, in job training, in distribution of surplus food, in program staffing, in job referral, in school lunch programs, and in higher education, the Negro has consistently been subjected to gross and extensive deprivation. And the Federal Government has paid the bill ").

the-board manner, and thereby *to avoid having to debate the issue in piecemeal fashion every time any one of these Federal assistance programs is before the Congress.*

*Id.* (emphasis added).

The need to settle the issue "once and for all" was a repeated theme of the debate surrounding Title VI. Senator Pastore, one of two Title VI "captains" on the Senate floor, referred to past occurrences of "acrimonious debate" on non-discrimination provisions, which had led to their defeat for fear that "if the provision prevailed, the Senate might become involved in prolonged or protracted debate, or even a filibuster, and the result might be no legislation whatever." 110 Cong. Rec. 7061. Thus, Senator Pastore explained: "It is to avoid such a situation that Title VI would constitute as *permanent* policy of the United States Government the principle that discrimination will not be tolerated. This would eliminate all the confusion and discussion that arise every time a grant bill comes before the Senate." *Id.* (emphasis added). Furthermore, explained Senator Pastore, enactment of Title VI "would also *avoid any basis for argument that the failure of Congress to adopt such nondiscrimination amendments* in connection with the particular program *implied congressional approval* of racial discrimination in that program." 110 Cong. Rec. 7062 (emphasis added).

This same theme was sounded in the House of Representatives by Representative Celler, who was the original sponsor of H.R. 7152 and also chaired the House Judiciary Committee, which had jurisdiction over the Civil Rights Act. Referring to prior attempts to enact nondiscrimination provisions as parts of individual bills, Celler explained: "Title VI enables the Congress to consider the overall issue of racial discrimination separately from the issue of the desirability of particular Federal assistance programs." 110 Cong. Rec. 2468 (1964). Furthermore, enactment of Title VI "would tend to insure that the policy of non-discrimination would be continued in future years *as a permanent part of our national policy.*" *Id.* (emphasis added).

Thus, it is clear that Title VI was intended to address, "once and for all," racial discrimination in federally funded programs. It represented the desire both to make a statement of fundamental national policy and to avoid repeated debate over that national policy. In fact, Title VI was apparently thought to answer the contention that noninclusion of discrimination prohibitions in particular legislation amounted to endorsement of discriminatory practices. Of course, the Congress that enacted Title VI could not make it permanent in the sense of its being irrevocable. Nevertheless, it is clear that Title VI was intended to be applicable to all programs or activities receiving federal financial assistance, and it should therefore be considered inapplicable only when there is a clear indication that Congress deliberately exempted certain programs or activities from its provisions.

## (2) The Other Cross-Cutting Statutes

The legislative histories of the three other nondiscrimination statutes are less illuminating. This is probably attributable to the fact that Congress had already

debated the concept behind this kind of legislation when it enacted Title VI. It is clear that Title IX, Section 504, and the Age Discrimination Act were modeled after Title VI. *See, e.g., Cannon* v. *University of Chicago,* 441 U.S. 677, 694 (1979) (Title IX patterned after Title VI); *NAACP* v. *Medical Center, Inc.,* 657 F.2d 1322, 1331 (3d Cir. 1981) (en banc) (§ 504 and Age Discrimination Act patterned after Title VI); *Brown* v. *Sibley,* 650 F.2d 760, 768 (5th Cir. 1981) ("Congress expressly modeled the discrimination prohibition contained in section 504 after the prohibitory language contained in Title VI and Title IX"). Thus, the fundamental purpose of legislation like Title VI, which had been thoroughly debated when Title VI itself was adopted, was not a particular focus of the debates. Instead, Congress devoted its attention to possible areas of coverage. For example, the Title IX debate focused not so much on the need to have a generally applicable prohibition of sex discrimination in federally funded education programs but instead on which institutions would be subject to its proscriptions—especially whether or to what extent religious, military, and single-sex-undergraduate institutions would be covered.

Nevertheless, it is clear that Title IX was intended to operate like Title VI, although it would apply in all aspects only to certain educational institutions. Thus, Representative Green, the floor manager of H.R. 7248, explained that Title IX (then Title X in the draft bill) was "really the same as the Civil Rights Act [Title VI] in terms of race." *See* 117 Cong. Rec. 39256 (1971). And Senator Bayh, who sponsored the draft language in the Senate bill, S. 659, explained that Title IX was intended to have comprehensive application to the covered institutions, in order to remedy "one of the great failings of the American educational system . . . the continuation of corrosive and unjustified discrimination against women." 118 Cong. Rec. 5803 (1972). Like Title VI, Title IX also reflected the "fairness" notion that American taxpayers should not be required to subsidize, through their taxes, programs, or activities that discriminated against some of them. *See* 117 Cong. Rec. 39257 (remarks of Rep. Green quoting Secretary of HEW quoting President Nixon) ("Neither the President nor the Congress nor the conscience of the Nation can permit money which comes from all the people to be used in a way which discriminates against some of the people."); *id.* at 39252 (remarks of Rep. Mink) ("Millions of women pay taxes into the Federal treasury and we collectively resent that these funds should be used for the support of institutions to which we are denied equal access.").

That Section 504 has roots in Title VI and Title IX is also clear. Although Section 504 of the 1973 Rehabilitation Act was enacted with virtually no legislative history, the next year the Senate Labor and Public Welfare Committee included the following statement in the legislative history of the Rehabilitation Act Amendments of 1974:

> Section 504 was patterned after, and is almost identical to, the anti-discrimination language of section 601 of the Civil Rights Act of 1964, 42 U.S.C. 2000d–1 (relating to race, color, or national origin), and section 901 of the Education Amendments of 1972, 42 U.S.C. 1683 (relating to sex). The section therefore

89

> constitutes the establishment of a broad government policy that
> programs receiving Federal financial assistance shall be operated
> without discrimination on the basis of handicap.

S. Rep. No. 1297, 93d Cong., 2d Sess. 39–40 (1974).[12] Thus, like Title VI and Title IX, Section 504 represents a broad statement of national policy intended to have application across-the-board. As explained in the 1974 Senate Report: "It is intended that Sections 503 and 504 be administered in such a manner that a *consistent, uniform, and effective Federal approach to discrimination against handicapped persons* would result." *Id.* at 40 (emphasis added).

The last of the nondiscrimination provisions under consideration is the Age Discrimination Act of 1975, which was enacted as part of the Older Americans Amendments of 1975, a comprehensive package directed to problems of the elderly. Representative Brademas, the House manager of the Amendments, explained of the House version: "title III . . . will clearly enunciate national policy that discrimination against the elderly based on their age will not be tolerated. . . ." 121 Cong. Rec. 9212 (1975). The Act was intended to have broad coverage and to apply not just to the elderly but to "age discrimination at all age levels, from the youngest to the oldest." *Id.* The broad applicability of the Age Discrimination Act was evidenced by explicit reference to its application to the most unrestricted kind of federal funding—general revenue sharing. *See* 42 U.S.C. § 6101 (1976) ("It is the purpose of this chapter to prohibit unreasonable discrimination on the basis of age in programs or activities receiving Federal financial assistance, *including* programs or activities receiving funds under the State and Local Fiscal Assistance Act of 1972 (31 U.S.C. 1221 et seq.).") (emphasis added).

Although the statute was "modeled on Title VI," *see* H.R. Conf. Rep. No. 670, 94th Cong., 1st Sess. 56 (1975), its coverage is less extensive than Title VI in one significant way: it prohibits only "unreasonable" age discrimination. Furthermore, Congress provided for delayed implementation of regulations as well as for preparation of an age-discrimination study, because of concerns that it had too little information about either the extent or the "reasonableness" of age discrimination in federally assisted programs. *See* 121 Cong. Rec. 37735 (1975) (remarks of Senator Eagleton). Nonetheless, as to "unreasonable" age discrimination, the Age Discrimination Act was modeled after Title VI and was intended to be a statement of national policy. *See* 121 Cong. Rec. 9212 (remarks of Rep. Brademas).

(3) General Application of the Four Cross-Cutting Statutes

The legislative histories of all four nondiscrimination statutes thus evidence a congressional intent to implement as national policy their prohibitions against

---

[12] Although subsequent comments are not a substitute for statements of legislative intent at the time of enactment, *see Southeastern Community College* v. *Davis*, 442 U.S. 397, 411 (1979), this statement has been regularly referred to by the courts, and § 504 is consistently construed as having its roots in Titles VI and IX. *See, e.g.*, *Pushkin* v *Regents of U. of Colo.*, 658 F.2d 1372 (10th Cir. 1981).

discrimination. While the later statutes have less extensive histories, it is clear that Title VI was intended to end the need for a program-by-program debate about the prohibition of racial discrimination. There is ample basis for concluding that Congress was implementing that same intent with the other three statutes by choosing Title VI as the model for those statutes and by enacting essentially the same broadly applicable language. Nothing in the history suggests that Congress intended later Congresses to be required to specify the applicability of these statutes to individual funding legislation—in fact, the evidence is to the contrary.

That the statutes have a broad sweep is also clear from their application not just to federal categorical programs, but to all "Federal financial assistance," "by way of *grant, loan,* or *contract* other than a contract of insurance or guaranty," *see* 20 U.S.C. § 1682; 42 U.S.C. § 2000d–1; 42 U.S.C. § 6103(a)(4) (adding "entitlement" to list) (emphasis added). *See also* 29 U.S.C. § 794a(2) (providing that remedies, procedures and rights set forth in Title VI shall be available under § 794). In fact, the Age Discrimination Act makes clear that the term "Federal financial assistance" includes general revenue sharing, *see* 42 U.S.C. § 6101, a form of federal assistance that is essentially unrestricted as to the purposes for which it may be used.

Thus, the statutes are fundamental pieces of legislation intended to remedy perceived wrongs to those discriminated against on the basis of race, sex, handicapped status, and age. Their language and legislative histories evidence a broad purpose to be given effect through across-the-board application whether or not a particular program specifically incorporates the nondiscrimination statutes.

## B. Enforcement Procedures

To achieve the goal of ending discrimination on the bases prohibited by the statutes, Congress has provided for an administrative scheme of enforcement, which favors conciliation over termination of funds and is designed to provide certain safeguards for fund recipients. *See* 110 Cong. Rec. 7066 (1964) (remarks of Sen. Ribicoff). Thus, the statutes direct the issuance of rules or regulations of general applicability and prohibit termination of funds until the recipient is informed of its failure to comply and the administrative agency has determined that voluntary compliance cannot be secured. Termination may occur only after filing a report with Congress and the expiration of a 30-day waiting period after filing such a report. Termination is limited to the particular noncomplying program. *See* 20 U.S.C. § 1682; 42 U.S.C., § 2000d–1; *id.,* § 6104.[13] Each agency that administers federal financial assistance issues clarifying regulations as to the relevant nondiscrimination statutes, setting forth the discriminations prohibited, assurances required, and compliance information. *See, e.g.,* 45 C.F.R., Parts 80, 81, 84, 90 (1980). By Executive Order 12250, the Attorney General is directed to coordinate implementation and enforcement of Title VI, Title IX, Section 504, and any other provision prohibiting discrimination in federally assisted programs.

---

[13] By express provision, Section 504 is to be administered under the same terms as Title VI.

When Congress has actually specified that the nondiscrimination provisions apply to particular legislation extending financial assistance, it often has also provided for a different or more detailed administrative enforcement mechanism than is provided in the underlying cross-cutting statutes, or has added to the categories of prohibited discriminations. *See, e.g.*, State and Local Fiscal Assistance Act of 1972, as amended, 31 U.S.C.A. § 6716 (1982); Community Development Block Grant of 1974, 42 U.S.C. § 5309 (1976); Omnibus Crime Control and Safe Streets Act of 1968, as amended, *id.* § 3789d (1982). These differences may account for Congress' making specific reference to the nondiscrimination statutes. Thus, specific reference to the nondiscrimination statutes is not necessarily an indication that Congress believes the statutes to be otherwise inapplicable.[14]

---

[14] The State and Local Fiscal Assistance Act provides:

> No person in the United States shall, on the ground of race, color, national origin, or sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity of a State government or unit of local government, which government or unit receives funds made available under subchapter I . . . . Any prohibition against discrimination on the basis of age under the Age Discrimination Act of 1975 [42 U.S.C 6101 et seq.] or with respect to an otherwise qualified handicapped individual as provided in section [504] shall also apply

31 U.S.C. § 1242(a)(1) (1976).

The inclusion of a reference to the Age Discrimination Act in this revenue sharing act illustrates that specific reference to a cross-cutting statute does not necessarily reflect a congressional determination that the cross-cutting statute is otherwise inapplicable To the contrary, the Age Discrimination Act itself explicitly provides that "federal financial assistance" includes revenue sharing under the Fiscal Assistance Act and would have been applicable in any event. The Fiscal Assistance Act did establish different enforcement procedures and broader applicability, however As understood by the sponsor of the 1976 nondiscrimination amendment to the Fiscal Assistance Act, the prohibition against age discrimination in the revenue sharing act had independent significance

> This provision is similar to the provisions of the Age Discrimination Act of 1975 That Act prohibits "unreasonable" age discrimination in programs and activities receiving Federal financial assistance, including revenue sharing funds. The Committee intends that its amendment to the Revenue Sharing Act be considered *a separate and independent statutory right* that age discrimination not be practiced by governments receiving revenue sharing funds. It is important that the Committee amendment be interpreted in this manner, rather than be viewed strictly as an endorsement of the Congress' actions in the 1975 Age Discrimination Act Unlike the 1975 Act, the Committee bill would prohibit age discrimination in all activities or programs of revenue sharing recipients, rather than merely those in those programs and activities receiving revenue sharing funds As indicated above, the Committee adopted this approach in its bill because of the serious problem of the fungibility of funds Also, unlike the 1975 Act, the Committee measure establishes more detailed and automatic suspension and termination procedures, and does not delay effectiveness of the provision until January 1, 1979 Because of these significant distinctions, in terms of the broadness of the prohibition and the remedies provided, it is imperative that the Committee bill not be subject to a limited or narrow interpretation based on the 1975 Age Discrimination Act Rather, *the Committee bill and the 1975 legislation are to be viewed as independent yet complementary measures.* Both seek to insure the elimination of unreasonable age discrimination which is federally financed, but they nevertheless establish different approaches to the overall prohibition as well as to the enforcement mechanism The Committee intends that through cooperation agreements (discussed hereinafter) the various Departments responsible for enforcement under the two laws will coordinate, to the greatest extent possible, those enforcement efforts.

H.R Rep. No 1165, 94th Cong., 2d Sess 98 n.4a (1976) (additional views of Rep. Robert F Drinan) (emphasis added).

It also appears that inclusion of a nondiscrimination provision in the Safe Streets Act need not be interpreted to signify a congressional belief that Title VI would otherwise be inapplicable *See* H. Rep. No. 249, 93d Cong., 1st Sess. 7 [1973]:

> For the first time the Act itself contains provisions protecting civil rights and civil liberties. In addition to deleting prohibitions against conditioning a grant on the adoption by an applicant of a quota system or other program to achieve racial balance, the bill *reiterates* the anti-discrimination requirements of title VI of the Civil Rights Act of 1964, but also prohibits discrimination on the basis of sex The bill strengthens the ban on discrimination by *making clear that the fund cut-off provisions of section 509 of the Act and of title VI of the Civil Rights Act of 1964 both apply,* and that appropriate civil actions may be filed by the Administration and that "pattern and practice" suits may be filed by the Attorney General.

(Emphasis added )

92

## C. Summary

The statutory language and legislative histories of the four nondiscrimination statutes reveal that the statutes are congressional statements of fundamental national policy intended to have across-the-board application not just to federal categorical programs but to nearly all forms of federal financial assistance, including grants, loans, and most contracts. While Title VI and Title IX might be said to prohibit discrimination that is also prohibited by the Constitution, it is not clear that they are merely redundant of existing rights.[15] In any event, Section 504 and the Age Discrimination Act prohibit discrimination not otherwise prohibited by the Constitution. Additionally, the four statutes provide for administrative means of enforcement that are designed to provide certain safeguards while also accomplishing the objective of ending discriminatory activities. *See* 110 Cong. Rec. 7066 (1964) (remarks of Sen. Ribicoff).

Thus, the statutes stand as important components of the national body of antidiscrimination law, intended to apply to all programs or activities receiving federal financial assistance without being explicitly referenced in subsequent legislation. They should therefore be considered applicable to all legislation authorizing federal financial assistance—which includes not only grants and loans, but also most contracts—unless Congress evidences a contrary intent.

## III. The Block Grants

### A. Background

Federal funding has traditionally been in the form of categorical grants, which can be used only for specific programs designated by Congress and as directed by usually detailed federal regulations.[16] Two other forms of federal funding, block grants[17] and general revenue sharing, provide for less restrictive use of federal funds by the states. Block grants generally consolidate several categorical programs into "federal payments to state or local governments for generally

---

[15] Language in the *Bakke* case suggests that Title VI may be coextensive with constitutional guarantees. *See Regents of University of California v. Bakke,* 438 U.S 265. 284 (1978) ("[e]xamination of the voluminous legislative history of Title VI reveals a congressional intent to halt federal funding of entities that violate a prohibition of racial discrimination similar to that of the Constitution"). In *Lau v Nichols.* 414 U.S. 563 (1974), however, the Supreme Court had applied a "discriminatory-effects" test under Title VI It has been suggested that *Bakke* overruled *Lau sub silentio,* thus requiring proof of discriminatory intent, *see Washington v Davis,* 426 U S. 229, 239 (1976), but the Court has declined to rule whether Title VI incorporates the constitutional standard. *See Board of Education* v. *Harris,* 444 U S 130, 149 (1979) Some courts therefore have applied an "impact-only" analysis to suits brought under the statutes *See NAACP v Medical Center, Inc .* 657 F 2d at 1331 (3d Cir. 1981) (en banc) (Title VI, § 504, and Age Discrimination Act)

[16] "What truly characterizes a categorical grant is that it is administered by the Federal bureaucracy, and it is this aspect of categorical programs that President Reagan finds most objectionable." 127 Cong Rec. S6821 (daily ed. June 24, 1981) (remarks of Sen Hatch).

[17] Block grants are not new to the Budget Reconciliation Act *See, e g.,* Omnibus Crime Control and Safe Streets Act of 1968, as amended, 42 U S C §§ 3701–3797, Community Development Block Grant of 1974, 42 U.S.C §§ 5301–5320 *See generally Block Grants· An Old Republican Idea,* 1981 Cong. Q 449 (Mar 14, 1981). In fact, the Social Services Block Grant amends Title XX of the Social Security Act, 42 U.S.C § 1397, an existing block grant Although Congress did not explicitly incorporate nondiscrimination provisions in the earlier version of Title XX, it has been assumed that nondiscrimination provisions apply to programs or activities receiving Title XX assistance *See Brown* v. *Sibley.* 650 F 2d 760. 769 (5th Cir. 1981) (§ 504 inapplicable because no allegation that two programs funded by Title XX were discriminatorily managed).

93

specified purposes, such as health, education, or law enforcement. The money must be spent on programs in the general area, but state or local officials make the decisions on specifically how the money is used." 1981 Cong. Q. 449 (Mar. 14, 1981). Put another way, "what distinguishes a block grant [from a categorical grant] is that it is directed at a broad purpose, and is administered by the grant recipient." *See* remarks of Sen. Hatch, 127 Cong. Rec. S6822 (daily ed. June 24, 1981). General revenue sharing is considered to be at the opposite end of the scale from categorical grants, because its use is "virtually unrestricted." *See* 1981 Cong. Q. 449. *See also Goolsby* v. *Blumenthal*, 581 F.2d 455, 465 (5th Cir. 1978) (Thornberry, J., dissenting) (revenue sharing is "vastly different" from block grants), *opinion adopted in relevant portion as opinion of the court*, 590 F.2d 1369 (5th Cir.) (en banc), *cert. denied*, 444 U.S. 970 (1979); *Ely* v. *Velde*, 497 F.2d 252, 256 (4th Cir. 1974) ("A block grant is not the same as unencumbered revenue sharing, for the grant comes with strings attached.").

The initiative to replace categorical programs with block grants to the states stems from several significant concerns. First, the block grants concept reflects a fundamental belief that state and local entities are better suited to choosing the proper programs or activities for their citizens than is the federal government.[18] Decentralization of allocational decisionmaking is also intended to result in increased efficiencies.[19] As Senator Hatch explained in Senate debate over the Reconciliation Act:

> The block grants will reduce bureaucratic overhead. They will give the states greater flexibility for efficient management and for the setting of priorities. Scarce dollars must be used for the most pressing needs in the most practical way. The huge and remote Federal bureaucracy is not suited to these purposes. The States are better situated to do the job.

127 Cong. Rec. S6821 (daily ed. June 24, 1981). Increased efficiency through elimination of numerous regulatory requirements is intended to enable the federal government to fund programs at lower levels than would otherwise be necessary and thus to result in substantial savings.

---

[18] *See* Letter from Secretary of Education T.H. Bell to Thomas P. O'Neill, Jr (Apr 28, 1981) (transmitting proposed Elementary and Secondary Education Consolidation Act of 1981) ("The proposed legislation would permit States and localities to make the decisions, as they most appropriately can, as to how, when and where educational services should be provided, about priorities among needs, and about what services should be offered "), Letter from HHS Secretary Richard Schweiker to Thomas P. O'Neill (transmitting proposed Social Services Block Grant) ("the proposal will help to restore to the States the major role which should be theirs in assessing and responding to the social services needs of their population. By removing requirements and earmarks giving priority to certain services and certain population groups, the draft bill will greatly increase the ability of State and local governments to concentrate their resources on meeting their most serious social service needs.") *See also* 1981 Cong Q 449 (Mar 14, 1981) (quoting Administration's Mar. 10 budget "The federal government in Washington has no special wisdom in dealing with many of the social and educational issues faced at the state and local level ")

[19] *See, e g.,* Letter from HHS Secretary Richard Schweiker, *supra* note 18 ("by eliminating many Federal administrative requirements, reporting requirements, standards and the like, the draft bill will permit more efficient administration of the States' social services programs, thus freeing resources for the provision of services and producing significant cost savings").

94

The Elementary and Secondary Education Block Grant, known as the "Education Consolidation and Improvement Act of 1981," addresses two areas of education funding: (1) funding for the educational needs of disadvantaged children (Chapter 1) and (2) consolidation of federal programs previously under several other programs "to be used in accordance with the educational needs and priorities of State and local educational agencies as determined by such agencies." (Chapter 2.) In both chapters, Congress has clearly expressed its intent to place supervision, direction, and control in the hands of state and local authorities. *See* §§ 552, 561(a)(6), 95 Stat. at 463, 562. Chapter 1 funding is to be accomplished "in a manner which will eliminate burdensome, unnecessary, and unproductive paperwork," *id.* § 552, and Chapter 2 is designed to "greatly reduce the enormous administrative and paperwork burden imposed on schools at the expense of their ability to educate children." *Id.* § 561(a).

The Social Services Block Grant amends an existing social services block grant, Title XX of the Social Security Act, 42 U.S.C. § 1397. *See* note 17, *supra.* Its purposes are

> consolidating Federal assistance to States for social services into a single grant, increasing State flexibility in using social service grants, and encouraging each State, as far as practicable under the conditions in that State, to furnish services directed at the goals of—
>
> > (1) achieving or maintaining economic self-support to prevent, reduce, or eliminate dependency;
> > (2) achieving or maintaining self-sufficiency, including reduction or prevention of dependency;
> > (3) preventing or remedying neglect, abuse, or exploitation of children and adults unable to protect their own interests, or preserving, rehabilitating or reuniting families;
> > (4) preventing or reducing inappropriate institutional care by providing for community-based care, home-based care, or other forms of less intensive care; and
> > (5) securing referral or admission for institutional care when other forms of care are not appropriate, or providing services to individuals in institutions.

*See* § 2001, 95 Stat. at 867.

Both of these block grants enacted by Congress are somewhat more limited than those initially proposed by the Administration. In the education area, for example, the Administration sought to consolidate 44 existing programs into two block grants. *See* 127 Cong. Rec. S4329 (daily ed. May 4, 1981) (remarks of Sen. Hatch introducing Administration's draft legislation). Proposed Chapter 1 sought to consolidate federal assistance for several programs, including major

federal programs for disadvantaged children (Title 1 of the Elementary and Secondary Education Act (ESEA)) and handicapped children (Pub. L. 94-142). Chapter 1 as enacted by Congress, however, left Title 1 of the ESEA intact as to formula and method of distributing funds, and purposes for using those funds, and did not consolidate programs for the handicapped. Chapter 2 consolidated approximately 30 smaller programs into a single block grant. *See* 127 Cong. Rec. H5795–5796 (daily ed. July 31, 1981) (remarks of Rep. Ashbrook explaining Conference resolution).

The Administration's proposed Social Services Block Grant also sought to consolidate and repeal numerous programs: Title XX of the Social Security Act; the child welfare and foster care and adoption assistance programs under parts B and E of Title VI of that Act; the authority in five titles of that Act for provisions of social services in the territories; the Developmental Disabilities Assistance and Bill of Rights Act; the Child Abuse Acts of 1974 and 1978; the Runaway and Homeless Youth Act; the Rehabilitation Act of 1973 (except definition of "handicapped" and nondiscrimination provisions); and certain sections of the Community Services Act of 1974. The Social Services Block Grant eventually adopted by Congress, however, essentially amended Title XX, the existing social services block grant. A separate community services block grant was also enacted. *See* § 671, 95 Stat. at 511.

Although, Congress clearly intended the block grant mechanism to decrease federal involvement in program administration, the Education and Social Services Block Grants are not without federal requirements. Chapter 1 of the Education Block Grant, for example, essentially leaves intact Title 1 of the Elementary and Secondary Education Act, although removing "those detailed requirements and instructions on how to conduct programs which caused most of a staggering 5 million hours of paperwork each year. . . ." *See* 127 Cong. Rec. H5796 (daily ed. July 31, 1981) (remarks of Rep. Ashbrook explaining conference resolution). Funds must be used only for specified purposes and are distributed according to prior formulas and methods. The states may be required to keep records necessary for fiscal audit and program evaluation, and local agencies may receive funds only after the state approves applications expressing intended uses of the funds. The application must contain assurances as to accurate recordkeeping, which must reflect that programs and projects are conducted in attendance areas with high concentrations of low-income children, and that the need for such programs, and their size, shape, and quality have been assessed and evaluated. *See* § 557(b), 95 Stat. at 466. Chapter 2 requires states to utilize an advisory committee representing school children, teachers, parents, local boards, administrators, institutions of higher education, and the state legislature, for advice and annual evaluation, and requires recordkeeping for fiscal accountability, as well as requiring that local agencies file applications with the states and keep necessary records. Maintenance-of-effort provisions are retained in a modified form. Subchapter A funds may be used for basic skills development. Subchapter B funds may be used for educational improvement and support services and subchapter C funds for special projects, with both subchapters providing a list of

specific "authorized activities." The intent to decrease federal involvement is manifested not by a prohibition of federal regulations but rather by the authorization of a relatively narrow range of regulations in matters related to "planning, developing, implementing, and evaluating programs and projects. . . ." *See* § 591, 95 Stat. at 480.

Similarly, under the Social Services Block Grant, the states are required to develop, make public, and submit to the Secretary of HHS a report on intended use of the funds, including information on the types of activities to be funded and the individuals to be served. Every two years, detailed reports regarding expenditures must be submitted by the states and audits must be conducted. Federal requirements as to amounts to be spent on welfare recipients and income levels of recipients are *not* included, however. The states are specifically prohibited from using the funds for seven forms of services, ranging from land purchases to cash payments. *See generally* H.R. Conf. Rep. No. 208, 97th Cong., 1st Sess. 654, 989–92 (1981).

All block grants enacted by the Reconciliation Act are also subject to the provisions of §§ 1741–45 of that Act. Section 1742 requires each state to report on the proposed use of block grant funds, including: (1) goals and objectives; (2) activities to be supported, areas to be served, and "categories or characteristics" of individuals to be served; and (3) the criteria and method for fund distribution. Pursuant to § 1745, states are required to conduct financial and compliance audits of block grant funds.

## C. Theoretical Application of the Nondiscrimination Statutes to Block Grants

The two block grants are not unrestricted grants of federal monies to be used by the states in any manner they choose. While clearly consolidating and "defederalizing" prior programs, the block grants nevertheless specify the purposes for which the funds are to be used (though permitting some selection within the group of permissible purposes) and impose reporting and other requirements designed to ensure the accountability of those receiving the funds. These requirements enable tracing of block grant funds to specific programs and activities. Thus, it appears that the cross-cutting requirements of nondiscrimination can be imposed on specific programs or activities receiving block grant funds. Additionally, fund termination, if necessary, can be accomplished as to those specific programs or activities found to have discriminated.

Even general revenue sharing to state and local governments, which is a form of federal assistance not limited to specific areas or purposes, is subject to the nondiscrimination laws. Revenue sharing is generally considered to entail even less federal involvement than block grant funding. Congress has nevertheless made explicit its intention that the nondiscrimination statutes apply to *all* programs or activities of a recipient government. *See* note 14, *supra*. State or local governments may avoid the nondiscrimination requirements only by demonstrating, "by clear and convincing evidence," that the program or activity alleged to be discriminating is not funded in whole or in part with revenue-sharing funds.

*See* State and Local Fiscal Assistance Act of 1972, as amended, 31 U.S.C. § 6716 (1982). That Congress made nondiscrimination requirements explicitly applicable to revenue sharing is not necessarily an indication that they would otherwise be inapplicable. *See* note 14, *supra*. Moreover, it is clear that Congress chose to require more stringent enforcement—and to make its nondiscrimination provision applicable to *all* activities of a recipient government (except where completely unrelated to federal funding)—because of the poor nondiscrimination enforcement record of the revenue sharing program to date. *See* H.R. Rep. No. 1165, cited *supra* note 14, at 13. Thus, even at the opposite end of the scale from traditional categorical funding, when providing federal assistance virtually unrestricted as to purpose or use, Congress has made clear that the national policy against discrimination applies.

The cross-cutting statutes apply by their terms to all programs or activities "receiving Federal financial assistance." Absent evidence of congressional intent to the contrary, there is no indication apparent from the language of the block grants that Congress intended block grant funding to be other than "federal financial assistance" subject to the provisions of the nondiscrimination statutes. In fact, the two relevant block grants specifically use the terms "financial assistance" or "Federal assistance." *See* Elementary and Secondary Education Block Grant, §§ 552, 561; Social Services Block Grant, § 2001. Furthermore, application of the nondiscrimination statutes to the block grants is both consistent with the congressional intent to have the nondiscrimination statutes apply to all federal financial assistance, and consistent with the principle underlying passage of the cross-cutting statutes, that federal taxpayers should not be required to subsidize programs or activities that discriminate against some of them. Thus, absent some indication to the contrary in the language or legislative history of the two relevant block grants, the nondiscrimination statutes should be considered to apply to the block grant programs or activities. We therefore proceed to consider whether Congress has evidenced an intent that the statutes not apply.

### IV. The Applicable Legal Standard

The Education and the Social Services Block Grants do not specifically exempt programs or activities funded by them from the obligations not to discriminate embodied in Title VI, Title IX, Section 504, and the Age Discrimination Act. Nevertheless, due to the importance of the question, it is appropriate to consider whether there is any indication, in the statute or its legislative history, to suggest that Congress actually intended such a result. The courts generally require a clear indication of such intent, because Congress is presumed to be aware of the entire body of law, and thus to be aware of prior statutes when it enacts later ones. Presumably Congress would make express its intent to modify or preclude the applicability of a prior statute that would otherwise embrace the subject of the later enactment. *See* 1A, C. Sands, Sutherland Statutory Construction, § 23.10 (3d ed. 1972). Courts are reluctant, therefore, to find that Congress effected a partial "repeal" or "amendment" of a prior statute by implication. *See* note 20, *infra*, and accompanying text.

The classic "repeal by implication" is a total abrogation of a previous statutory provision by enactment of subsequent legislation. *See, e.g., Morton* v. *Mancari,* 417 U.S. 535 (1974) (rejecting contention that Equal Employment Opportunity Act impliedly repealed Indian preference provisions of Indian Reorganization Act); *cf. United States* v. *United Continental Tuna Corp.,* 425 U.S. 164 (1976) ("repeal" urged would not actually abrogate prior statute, but would make it ineffectual in nearly all cases). Other implied changes, such as implied "exemptions," *see Goolsby* v. *Blumenthal,* 581 F.2d 455, 461 (5th Cir. 1978), *rev'd en banc on other grounds,* 590 F.2d 1369 (5th Cir.), *cert. denied,* 444 U.S. 970 (1979), or implied "amendments," *see Ely* v. *Velde,* 451 F.2d 1130, 1134 (4th Cir. 1971), however, are also analyzed according to the rules applicable to repeals by implication.

Two recent Supreme Court cases illustrate the rules of construction to be applied to questions such as the one presented by your memorandum. In *Allen* v. *McCurry,* 449 U.S. 90 (1980), the Court considered whether 28 U.S.C. § 1738 and traditional principles of collateral estoppel apply to suits brought under 42 U.S.C. § 1983. McCurry had unsuccessfully sought to suppress evidence in his state criminal trial. He later brought a federal civil rights action under § 1983 against the police officers who had entered his home and seized evidence. McCurry argued that he should not be bound by the state court's disposition of his federal constitutional claim because he had had no opportunity to litigate that claim in federal court. Thus, he asserted in effect that § 1738, which requires federal courts to give the same effect to state court judgments as the state court would, and traditional principles of collateral estoppel were inapplicable to his claim brought under § 1983. The Supreme Court analyzed this argument as one suggesting that § 1983 impliedly "repealed" or "restricted" both collateral estoppel principles and the statutory forerunner to § 1738. The Court rejected this argument, applying the maxim that repeals by implication are disfavored, even though "one strong motive" behind enactment of § 1983 was "grave congressional concern that the state courts had been deficient in protecting federal rights," *see id.* at 98–99, a motive that provided some support for the "repeal" or "restriction" asserted by McCurry.

Similarly, in *TVA* v. *Hill,* 437 U.S. 153 (1978), the Court was asked to decide whether the Endangered Species Act permitted an injunction against operation of the nearly completed Tellico Dam because of the dam's effect on an endangered species. Congress had continued to appropriate money for the dam notwithstanding the Appropriations Committee's knowledge of the effect of the dam on the habitat of the endangered species. Tennessee Valley Authority (TVA) argued, therefore, that the subsequent appropriations constituted a congressional determination to permit operation of the dam despite the provisions of the Act. The Court, in an opinion by the Chief Justice, framed the issue in terms of "whether continued congressional appropriations for the [Dam] after 1973 constituted an implied repeal of the Endangered Species Act *at least as to the particular dam.*" *Id.* at 156 (emphasis added). The Court determined that to find an implied

"repeal" under the circumstances of the case would violate the cardinal rule disfavoring such repeals.

These cases illustrate that it is appropriate to apply the "repeal" or "amendment" by implication analysis to the contention that Congress did not intend these four nondiscrimination statutes to apply to programs or activities funded by the two block grants. Because the cross-cutting nondiscrimination statutes apply by their terms to all programs or activities "receiving Federal financial assistance," they apply to the block grants unless Congress specifically exempted the block grants or, by implication, "amended" the cross-cutting provisions to prevent their otherwise automatic applicability. *See also, e.g., Watt v. Alaska,* 451 U.S. 259 (1981) (contention that Wildlife Refuge Revenue Sharing Act, rather than earlier enacted Mineral Leasing Act, controls distribution of mineral revenues from wildlife refuges) (dissent contended that disfavor of repeals by implication should have force only when "general statute, wholly occupying a field, eviscerates an earlier and more specific enactment of limited coverage . . . without an indication of congressional intent to do so," *id.* at 280); *Radzanower v. Touche Ross & Co.,* 426 U.S. 148 (1976) (contention that when bank is sued under Securities Exchange Act it is subject to venue provisions of that Act, rather than to general venue provisions of previously enacted National Bank Act); *United States v. Borden Co.,* 308 U.S. 188 (1939) (contention that Agriculture Marketing Agreement Act removed agricultural marketing from purview of Sherman Antitrust Act).

The Fourth Circuit has applied this standard under analogous circumstances. *Ely v. Velde,* 451 F.2d 1130 (4th Cir. 1971), required the Fourth Circuit to determine the implied applicability of two other "cross-cutting" laws—the National Historic Preservation Act (NHPA) and the National Environmental Policy Act (NEPA)—to a law enforcement block grant—the Omnibus Crime Control and Safe Streets Act of 1968. Because the Safe Streets Act generally prohibited federal interference in the spending of grants except as expressly authorized, the Law Enforcement Assistance Administration (LEAA) argued that it could not apply the requirements of NHPA and NEPA. *Id.* at 1133. The court rejected the argument that the block grant and the cross-cutting laws were irreconcilable, however, applying the "strong presumption against one statute repealing or amending another by implication," *see id.* at 1134, to examine the purposes and policies of the allegedly conflicting statutes and give effect to all three. *But cf. Goolsby v. Blumenthal,* 581 F.2d 455, 464 (5th Cir. 1978) (Thornberry, J., dissenting) (Revenue-Sharing and Uniform Relocation Assistance Acts irreconcilable; only acts specifically mentioned in Revenue-Sharing Act applicable) (distinguishing block grants from revenue sharing because revenue sharing provides for automatic distribution and because of difficulty in determining how revenue-sharing money is spent), *opinion adopted in relevant portion as opinion of court,* 590 F.2d 1369 (5th Cir.) (en banc), *cert. denied,* 444 U.S. 970 (1979).

These and other cases establish (1) that Congress' intention to exempt the block grants from the nondiscrimination statutes should be assessed in the context of whether Congress intended the block grants to act as an implied partial

100

"repeal" of, or "amendment" to, the earlier statutes; and (2) such "repeals" or "amendments" by implication are not favored. *See Morton* v. *Mancari*, 417 U.S. at 549. In short, where possible, the earlier and later statutes will be read as consistent with each other, *see Watt* v. *Alaska*, 451 U.S. 259, 267 (1981) and, absent a clear indication to the contrary, courts will presume that the later statute was enacted against the background of the earlier one, and was intended to be affected by it. This analysis applies both to the total abrogation of a statute, *see id.*, and to partial repeals or amendments affecting only a "tiny fraction" of cases brought under either the earlier or later statute, *see Radzanower* v. *Touche Ross & Co.*, 426 U.S. at 156.

> The presumption against implied repeals is classically founded upon the doctrine that the legislature is presumed to envision the whole body of the law when it enacts new legislation, and, therefore, if a repeal of the prior law is intended, expressly to designate the offending provisions rather than to leave the repeal to arise by necessary implication from the later enactment. Still more basic, however, is the assumption that existing statutory and common law, as well as ancient law, is representative of popular will. As traditional and customary rules, the presumption is against their alteration or repeal. The presumption has been said to have special application to important public statutes of long standing.[20]

1A, C. Sands, Sutherland Statutory Construction § 23.10 (4th ed. 1972) (footnotes omitted).

The presumption against implied repeals or amendments is given effect through a requirement that the legislature's intention to repeal must be "clear and manifest." *United States* v. *Borden Co.*, 308 U.S. 188, 198 (1939). "In practical terms, this 'cardinal rule' means that '[i]n the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable.'" *TVA* v. *Hill*, 437 U.S. at 190 (quoting *Morton* v. *Mancari*, 417 U.S. at 550). The Supreme Court has explained: "We must read the statutes to give effect to each if we can do so while preserving their sense and purpose." *Watt* v. *Alaska*, 451 U.S. 259, 267 (1981). Thus, we must examine whether Congress intended the cross-cutting statutes to be inapplicable to the Education and the Social Services Block Grants by first attempting to ascertain if Congress made a "clear and manifest" expression of such intention, especially whether it made an affirmative expression of

---

[20] The presumption against implied repeals and amendments, strongest when applied to longstanding important public statutes, has force when more minor statutes are involved. *Compare Radzanower*, 426 U S at 154, with *id* at 158, 164–65 (Stevens, J., dissenting) (arguing that the rule against implied repeals should apply only to well-established and clearly defined old rules reflecting important national policy, but not to minor laws of whose existence and meaning Congress might have been unaware). The nondiscrimination statutes, while not all of longstanding, clearly articulate important national policy Moreover, they are not the kind of statutes of which Congress is likely to have been unaware Thus, the presumption against their implied repeal or amendment would seem to be particularly strong

101

such intent. If it did not do so, we must then examine whether the Education and the Social Services Block Grants and the four cross-cutting nondiscrimination statutes are irreconcilable. In the absence of either a clear expression of intent or irreconcilability between the two sets of statutes, the plain language of the nondiscrimination statutes, which would otherwise require them to apply to these two block grants, will prevail.

## V. Application of the Legal Standard

There are three possible indicators of congressional intent not to apply the nondiscrimination statutes to the Education and Social Services Block Grants: (A) the absence of any specific reference to the obligation not to discriminate; (B) Congress' failure to refer to the nondiscrimination provisions in these two block grants, while specifically referring to them in six other block grants; and (C) Congress' apparent deletion of nondiscrimination provisions from the Administration's proposed block grant legislation. Because we conclude that none of these provides a clear indication of congressional intent, we also examine (D) whether Congress' purposes in enacting these two block grants may be said to conflict with the nondiscrimination statutes, so as to require that the nondiscrimination statutes be inapplicable to these block grants.

### A. Absence of Specific Reference to the Nondiscrimination Statutes

It is clear from their legislative histories that the nondiscrimination statutes were intended to apply to federal financial assistance without Congress having to consider their applicability every time it authorized such assistance. Furthermore, the block grants at issue authorize the grant of "Federal assistance" or "financial assistance," and the relevant federal agencies have generally applicable regulations for enforcing the nondiscrimination statutes, which can be applied to the block grants without issuance of new regulations. *See, e.g.,* note 4, *supra*. Thus, there is no facially apparent reason why the nondiscrimination statutes should be considered inapplicable to the Education and the Social Services Block Grants merely because Congress made no specific reference in those block grants to the obligation not to discriminate. Since a central purpose of the nondiscrimination statutes was in fact to avoid the need for such specific application, we conclude that the mere absence of nondiscrimination provisions, without more, does not suggest that the four nondiscrimination statutes should be considered inapplicable.

### B. The "Expressio Unius" Doctrine

As an alternative indication of congressional intent not to apply the nondiscrimination provisions, we have also considered the fact that not all the block grants are merely silent as to application of the nondiscrimination statutes. Six other HHS and Education block grants contain specific nondiscrimination provisions. Four—(1) Preventive Health and Health Services, (2) Alcohol and Drug

Abuse and Mental Health Services, (3) Primary Care, and (4) Maternal and Child Health Services—specify in relevant part that, for purposes of applying Title VI, Title IX, Section 504, and the Age Discrimination Act, "programs and activities funded in whole or in part with funds made available under this title are considered to be *programs and activities receiving Federal financial assistance.*" *See* Reconciliation Act, §§ 901 (1908(a)(1); 1918(a)(1); 1930(a)(1)), 2192(a) (508(a)(1)) (emphasis added). These four block grants do not stop there, however, but also prohibit discrimination on the ground of sex or religion, and provide for a 60-day compliance period before resorting to enforcement under, *inter alia*, the cross-cutting statutes. Two other block grants—Community Services, § 671, and Low-Income Home Energy Assistance, § 2601—prohibit discrimination or exclusion from benefits on the basis of race, color, national origin, or sex, and further direct that "[a]ny prohibition against discrimination on the basis of age under the Age Discrimination Act of 1975 or with respect to an otherwise qualified handicapped individual as provided in section 504" shall apply. *See id.*, §§ 677, 2606. These two block grants also set forth procedures by which compliance with their nondiscrimination provisions may be secured, including the 60-day compliance period before resorting to remedies under Title VI, Section 504, and the Age Discrimination Act, "as may be applicable."

Applying the maxim *expressio unius est exclusio alterius,* it could be argued that because Congress specified in some block grants that the nondiscrimination laws would apply, its failure to do so in others should be viewed as an intentional exclusion. *See* 2A, C. Sands, Sutherland Statutory Construction § 47.23 (4th ed. 1973). This reading of an implied exclusion deserves particular attention, because the maxim is considered to have special force if a statute provides for something in one section but omits it in another. *See id.*

There are, however, several reasons that might explain why Congress failed to include nondiscrimination provisions in the Education and the Social Services Block Grants. First, as discussed in subsection C below, Congress may simply have decided that existing laws against discrimination should apply without change. It appears that there is some support for this explanation in the language of the nondiscrimination provisions originally proposed, both of which can be interpreted as assuming that existing law would apply, but attempting to add to or change it in some manner. Furthermore, the nondiscrimination provisions in the other six block grants are not merely repetitive of existing law but have independent significance: (1) all six prohibit discrimination on the basis of sex, although Title IX applies only to education programs; (2) four also prohibit discrimination on the basis of religion; and (3) all require that the chief executive officer of a state be given 60 days to secure compliance before the Secretary either refers the matter to the Attorney General or exercises the powers granted by Title VI, Section 504, or the Age Discrimination Act, "as may be applicable," or takes "such other action as may be provided by law." Because Congress was providing for new substantive obligations and remedies regarding nondiscrimination in the other six block grants, it would have been logical for Congress to have recited all of the nondiscrimination provisions applicable to those block grants, perhaps to

103

avoid a future contention that only discrimination on the basis of sex or religion had been prohibited. By failing to include similar provisions in the Education and the Social Services Block Grants, however, Congress may simply have intended that only existing nondiscrimination provisions, with their regular enforcement mechanisms—which apply to all programs or activities receiving federal financial assistance—should apply.[21]

Second, there is also a reason why Congress might have believed it to be unnecessary to mention the nondiscrimination statutes in the Education and the Social Services Block Grants, but necessary to mention them in the other six grants. The four cross-cutting statutes apply by their terms to programs or activities receiving "Federal financial assistance." Both the Education and the Social Services Block Grants specify that they are providing "federal" or "financial" assistance. The Elementary and Secondary Education Block Grant states in the Declaration of Policy in Chapter I, § 552, "[t]he Congress declares it to be the policy of the United States to continue to provide *financial assistance* to State and local educational agencies . . .," and in the Statement of Purpose in Chapter II, § 561, "[i]t is the further purpose and intent of Congress to *financially assist* state and local educational agencies . . . ." (Emphasis added.) The Social Services Block Grant begins its statement of purpose with the following language: "For the purposes of consolidating *Federal assistance* to States . . . ." § 2001 (emphasis added). In contrast, the four block grants that contain explicit statements that "[f]or the purpose of applying the prohibitions against discrimination" under the four cross-cutting statutes, programs funded by them "are considered to be programs or activities receiving Federal financial assistance," do not otherwise specifically refer to federal financial assistance. It is possible therefore that Congress simply wished to make clear that, in addition to its prohibition of sexual and religious discrimination, those four block grants were "federal financial assistance" for purposes of the four cross-cutting statutes. Similarly, the other two block grants containing nondiscrimination provisions have no explicit reference to the fact that they authorize "federal financial assistance." Thus, the language of these block grants suggests another reason why Congress might have differentiated between the Education and the Social Services Block Grants on the one hand and the six other block grants on the other.

The *expressio unius* maxim is not to be regarded as conclusive, especially when other factors suggest a different result. *See Morris* v. *Gressette,* 432 U.S. 491, 506 n.22 (1977) (express preclusion of judicial review in one section is relevant, but not decisive, as to reviewability in other sections).[22] Here, in addition to the existence of other explanations for the differences that initially appear to call for application of the maxim, there are other factors at play. The block grants are not merely separate sections of a comprehensive statute, but are

---

[21] This is also consistent with the fact that the existing Title XX Social Services Block Grant makes no specific reference to the nondiscrimination provisions.

[22] *See also, e.g., Wachovia Bank & Trust Co.* v *National Student Mktg Corp ,* 650 F.2d 342, 354–55 (D.C. Cir. 1980) ("The ancient maxim 'expressio unius est exclusio alterius' is a dangerous road map with which to explore legislative intent."), *cert. denied,* 452 U.S 954 (1981), 2A, Sutherland, *supra,* § 47 25 ("The maxim . . . requires great caution in its application, and in all cases is applicable only under certain conditions.").

in reality separate statutes relating to different substantive areas, pieced together for purposes of budget reconciliation. This suggests that application of the maxim, which assumes that Congress considered all possibilities together, has less force than it might in addressing a narrower statute. *Cf. United States* v. *Exxon Corp.,* 628 F.2d 70, 75 (D.C. Cir.) *(per curiam)* (rejecting application of maxim because, *inter alia,* two titles at issue differ in structure and direction), *cert. denied,* 446 U.S. 964 (1980). Particularly in light of the length of the Reconciliation Act, the speed with which it was enacted, and the pressing circumstances that surrounded its enactment, as discussed earlier, it is uncertain that the maxim should be given as much weight as it might normally have. The presumption against finding a repeal or amendment by implication also tends to dilute the force of the maxim. *See United States* v. *Exxon Corp.,* 628 F.2d at 75 (declining to read combination of legislative history and *expressio unius* theories as proof of repeal or amendment by implication).

In attempting to assess congressional intent, the *expressio unius* maxim may serve as a guide to that intent, but it is inconclusive. Other factors, including the reasons for the differences, the nature of the legislation, and the legislative history,[23] must also be considered in the effort to discern congressional intent. When all the factors are considered, we cannot conclude that the absence of nondiscrimination provisions in the Education and the Social Services Block Grants represents a congressional determination that Title VI, Title IX, Section 504, and the Age Discrimination Act not apply. Instead, Congress may merely have determined that existing law against discrimination should apply to these two block grants. Moreover, to the extent the *expressio unius* maxim might be said to provide some support for a finding that Congress intended nonap-

---

[23] It is not just the statute that is silent on inclusion or exclusion of the provisions Committee hearings, floor debates, and the House, Senate, and conference reports, which often discuss in some detail the differing versions and congressional intent, are virtually silent on this significant issue In our review of hundreds of pages of testimony, debate, and reports, we found only oblique references to nondiscrimination under the two relevent block grants

Dr. James P. Scamman, Superintendent of Schools in South Bend, Indiana, said:

> To put it bluntly, if you are going to make a local decision model work, you are going to have to rescind 94, 142, 504, and at least unemployment compensation not to kick in until the fall term begins when people aren't assured of a job in the spring.

*Hearings Before the Task Force on Human Resources and Block Grants of the Committee on the Budget,* House of Representatives, 97th Cong., 1st Sess , Part 1, 232 (1981). Another comment came from Representative Biaggi in floor debate, as he explained his opposition to block grants in general, apparently even those specifically containing nondiscrimination provisions:

> Let me illustrate a genuine fear that I have about these block grants. Age discrimination is an insidious problem in this Nation and one of the areas where it is practiced the most are in federally funded programs. When the Civil Rights Commission identified 10 major Federal programs where age discrimination was rampant. Congress responded with the enactment of the age discrimination amendments. What recourse will we have if age discrimination is practiced in the administration of these grants on the State level?

127 Cong. Rec H3911 (daily ed. June 26, 1981) Neither the comments of a committee witness nor the concerns of a single Representative amount to an expression of congressional intent to support the inference to be drawn from application of the *expressio unius* maxim This is especially true here where one reference ("94, 142, 504") is, at the least, obscure, and where the other represents concern apparently unrelated to specific incorporation of the nondiscrimination provisions

There were, of course, some other references in the legislative history to the nondiscrimination provisions originally proposed by the Administration These references were minimal, however, and we do not believe that they support the theory that the laws prohibiting discrimination were meant to be inapplicable. *See* discussion in subsection C, *infra.*

plicability, we cannot say that it is either "clear and manifest" or that it is the affirmative expression of intent required for finding a "repeal" or "amendment" by implication.

## C. Apparent Deletion of the Nondiscrimination Provisions

There is an additional factor to consider in assessing the absence of non-discrimination provisions in these two block grants: Congress' apparent deletion of nondiscrimination provisions from the block grants as originally proposed by the Administration. Based on our analysis of the legislative history of the block grants, however, we are unable to conclude that Congress ever intentionally "deleted" the nondiscrimination provisions from the Administration's proposals so as to make them inapplicable.

### (1) Education Block Grant

The nondiscrimination provision of the Administration's proposed Education Block Grant provided:

> Sec. 307(a). Whenever the Secretary determines that there has been a failure to comply with title VI of the Civil Rights Act of 1974, the Age Discrimination Act of 1975, section 504 of the Rehabilitation Act of 1973, or title IX of the Education Amendments of 1972 in any program or activity receiving Federal financial assistance under this Act, he shall notify the chief executive officer of the State and afford him an opportunity to secure compliance. If within a reasonable period of time, not to exceed sixty days, the chief executive officer does not secure compliance, the Secretary shall take such action as may be provided by law. The time afforded the chief executive officer under this subsection shall not reduce the time otherwise available to the Secretary to secure compliance.

> (b) When a matter is referred to the Attorney General pursuant to subsection (a) of this section, or whenever he has reason to believe that there has occurred a pattern or practice in violation of the civil rights provisions referred to in subsection (a) in any program or activity receiving Federal financial assistance under this Act, the Attorney General may bring a civil action in any appropriate United States district court for such relief as may be appropriate including injunctive relief.

Proposed Elementary and Secondary Education Consolidation Act of 1981, S. 1103 § 307a (127 Cong. Rec. S4332) (daily ed. May 4, 1981). The provision thus appears merely to have provided a method of enforcing the laws; it appears to have assumed their applicability to the Block Grant. The summary provided by Senator Hatch when he introduced the bill stated: "Basic nondiscrimination provisions are *preserved without change* from current law. However, in case of

106

violations, as determined by the Secretary, the *Governor has an additional 60 days to secure compliance before further action by the Department." Id.,* S4336 (emphasis added). Thus, the omission of this provision, absent explanation, is equally consistent either with the possibility that Congress intended the non-discrimination provisions not to apply or that it assumed they did, based on the indication that basic law was being "preserved without change," and merely decided that the regular enforcement procedures would apply.

Furthermore, because the Education Block Grant eventually enacted was not the one proposed by the Administration, it would be an overstatement to refer to the lack of such a provision in that bill as the result of a "deletion." The Education Block Grant proposed by the Administration was more sweeping than the bill eventually enacted. There was extensive resistance to including some of the programs the Administration proposed to include and the final product was termed a more modest effort. *See, e.g.,* 127 Cong. Rec. S6821 (daily ed. June 24, 1981) (remarks of Senator Hatch, Chairman of Comm. on Labor and Human Resources) ("Our proposals are more modest than President Reagan's. Our block grants do not compel the Nation to arrive at the new federalism on October 1. But they most definitely set us along President Reagan's road."). In the House, Representative Ashbrook, the ranking minority member of the Education and Labor Committee, tried to make clear that "Gramm-Latta II," the amendment to the Committee reconciliation package approved by the House, was *not authored* by the Administration:

> And let me put to rest—at least for our committee—all this loose
> talk about the proposals in the Latta amendment having been
> written by OMB or the White House. That just is not true. We did
> cooperate with them and accommodate their concerns where
> possible. But the substance of our major proposals, and the
> figures we use, were fashioned by our staff acting on our instruc-
> tions. In most areas there are very great differences from admin-
> istration proposals. This is particularly true with respect to educa-
> tion program consolidation, child nutrition, impact aid, and the
> social services block grant.

*Id.,* H3526–27 (daily ed. June 25, 1981). *See also id.,* S6821 (daily ed. June 24, 1981) (remarks of Sen. Hatch) ("Some have suggested that the President has suffered a political defeat because we in the Senate have turned from his original block grant proposals. They are wrong, and they miss the point. The essential question is not whether we support these proposals, but whether we support the President's ends. Obviously, we do.").

The legislative history of the Education Block Grant is at best ambiguous with respect to whether Congress "deleted" references to the nondiscrimination provisions or merely enacted a bill that, without explanation, contained none. The Education Block Grant, which received extensive attention on the House and Senate floors, was explained and debated in detail, without reference to the possibility that Congress had made nondiscrimination provisions inapplicable.

107

Given the tone of the discussion—an attempt to assuage concerns that not enough federal control remained in the block grants—it is difficult to infer a clear intent to make the federal nondiscrimination provisions inapplicable. We are reluctant to attach much significance to congressional omission of any reference to the nondiscrimination provisions when they would normally have been applicable without any such reference, especially in the absence of any reference to such omission.

## (2) Social Services Block Grant

Because the Social Services Block Grant received less attention in floor debate, it is even more difficult to determine whether Congress could be said intentionally to have deleted the nondiscrimination provisions. It is clear that the Administration's proposed block grant, which contained a nondiscrimination provision, was not finally enacted by Congress. However, even the proposed House Social Services Block Grant contained a nondiscrimination provision, including enforcement procedures differing from those provided in the four nondiscrimination statutes. The Senate version and the ultimate conference version of the Social Services Block Grant, however, made no reference to nondiscrimination. Although the absence of a provision in one of several versions might be said to suggest an intentional deletion, this does not seem to have been the case. First, the section-by-section analysis of the Administration's proposed Social Services Block Grant, inserted into the Record by its sponsor, Representative Ashbrook, is instructive:

> Section 10 of the draft bill, modeled on a section of [the] Housing and Community Development Act of 1974, prohibits discrimination on the ground of race, color, national origin, *or sex* in any program of activity funded under the Act, and also *expressly recognizes the application* of section 504 of the Rehabilitation Act of 1973, which prohibits discrimination against qualified handicapped persons, and the anti-discrimination provisions of the Age Discrimination Act of 1975. Whenever the Secretary determines that there has been a failure to comply with these nondiscrimination provisions, the Secretary must notify the Governor of the State. The Governor is given up to 60 days to secure compliance. If the Governor does not secure timely compliance, the Secretary may refer the matter to the Attorney General and recommend the commencement of a civil action to secure compliance. *Alternatively, the Attorney General may institute proceedings under current statutes, such as title VI of the Civil Rights Act of 1964, that now apply to discrimination.*

127 Cong. Rec. E2194 (daily ed. May 6, 1981) (emphasis added). As understood by its sponsor, the nondiscrimination provision did not "make" Section 504 and the Age Discrimination Act applicable, but rather "recognized" their ap-

plicability. The provision added sex discrimination as a general prohibition. Finally, Representative Ashbrook appeared to recognize that "current statutes, such as title VI," provided an *alternative* method of proceeding. *Id.* Thus, it is conceivable that "deletion" of the provision was merely intended to leave current nondiscrimination law as the only method of proceeding.

It is unclear whether Congress even thought in terms of "deletion." As explained in the summary of the reconciliation conference: "the House receded from its Social Services block grant and conferees agreed to a Title XX block grant and a community services block grant. Child welfare services and Foster Care and Adoption Assistance were retained as categorical programs." 127 Cong. Rec. H5759 (daily ed. July 31, 1981). The conference report referred to the rejected House Social Services Block Grant as a "new freestanding" block grant repealing Title XX social services and training, the Child Abuse Prevention, Adoption Reform, and Runaway and Homeless Youth Acts, and seven titles of the Community Services Act. *See* H.R. Conf. Rep. No. 208, 97th Cong., 1st Sess. 989 (1981). The conference agreement, however, was to a more modest block grant, amending Title XX to form a new block grant, which "generally follows the Senate amendment," although not incorporating child welfare, foster care, and adoption assistance programs. *See id.* at 991. In the conference report's rather detailed comparisons of the House and Senate versions, there is no reference to the absence of a nondiscrimination provision. Nor was there floor debate over inclusion or deletion of such a provision. Thus, like the Education Block Grant, it is unclear whether Congress intentionally deleted the non-discrimination provision or merely enacted a different block grant that contained no such provision. Because of the enactment of a substantially different block grant from the one that contained a nondiscrimination provision, and in light of the absence of any reference to a "deletion" of the nondiscrimination provisions, and the presence of another plausible interpretation of any "deletion," it is at best uncertain whether Congress intentionally "deleted" the nondiscrimination provisions to make them inapplicable. It is as appropriate to conclude merely that Congress enacted a block grant silent as to their applicability. Therefore, the absence of the provisions from the final version, under these circumstances, provides no more than highly equivocal support for finding an implied "repeal" or "amendment," when much clearer support is required. *See Allen* v. *McCurry,* 449 U.S. 90, 99 (1980).

(3) Conclusion Regarding Intentional Deletion of Nondiscrimination Provisions

We conclude, therefore, that Congress' intention to make the nondiscrimination statutes inapplicable is at best ambiguous insofar as the finding of such an intention relies on the apparent "deletion" of nondiscrimination provisions from prior versions of these two block grants. There is no indication that Congress gave any thought to such a "deletion," and the absence of nondiscrimination provisions is as consistent with a congressional determination to leave existing

109

law intact as it is with an intention to exempt the block grants from the four cross-cutting statutes.

### D. Conflict Between the Block Grants and the Nondiscrimination Statutes

Because there is no clear indication of congressional intent to make the nondiscrimination statutes inapplicable to programs or activities funded by the Education and the Social Services Block Grants, they should be considered to be inapplicable only if there is an irreconcilable conflict between the block grants and the nondiscrimination statutes. Your memorandum suggests an important ground upon which the block grants and the nondiscrimination statutes may be in conflict: Congress' intent in enacting block grants to free the states of "federal encumbrances and regulations other than those specifically imposed by the Act." To apply the nondiscrimination provisions, it is suggested, would be directly contrary to the intent.

We have found no meaningful evidence, however, that the nondiscrimination statutes are the kinds of federal "interference" with which Congress or the Administration was concerned. To reduce bureaucratic overhead and permit the states to set their own program priorities, the Education Block Grant expressed the intent in Chapter 1 that the *design and implementation of the programs* authorized under that Chapter be "mainly that of local educational agencies, school superintendents and principals, and classroom teachers and supporting personnel, because they have the most direct contact with students and are most directly responsible to parents." § 561(b) (emphasis added). In Chapter 2, Congress directed that the Secretary issue no regulations in most matters "relating to the details of *planning, developing, implementing, and evaluating programs and projects* by state and local educational agencies." § 591(b) (emphasis added). The Social Services Block Grant is intended to "increase State flexibility" in furnishing social services directed at five goals. § 2352 (§ 2001). Congress' focus therefore appears to have been on reducing "those detailed requirements and instructions on *how to conduct programs,*" *see* 127 Cong. Rec. H5796 (daily ed. July 31, 1981) (remarks of Rep. Ashbrook) (emphasis added), which force the states to spend great amounts of time and energy on federally imposed program details. As Senator Hatch, a strong proponent of block grants, said, the objection to categorical programs is the involvement of the federal bureaucracy in their administration. *See* note 16, *supra.* Block grants are intended to effect a significant reduction in this involvement.

The nondiscrimination statutes clearly impose regulatory burdens on fund recipients and decrease the "flexibility" of those recipients to the extent they would choose to use federal funds in a manner otherwise prohibited by the cross-cutting statutes; that is, by expending the money in ways that discriminate on the basis of race, sex, age, or handicap. We believe, however, that this apparent conflict does not actually make the cross-cutting statutes and the two block grants irreconcilable, particularly when every attempt must be made to read the two sets of statutes in a way that permits each to be effective. *See, e.g., Morton* v.

*Mancari*, 417 U.S. at 551. In applying NHPA and NEPA to a block grant, the Fourth Circuit stated, "in the absence of unmistakable language to the contrary, we should hesitate to read the congressional solution to one problem—protection of local police autonomy—so broadly as unnecessarily to undercut solutions adopted by Congress to preserve and protect other societal values, such as the natural and cultural environment. It is not to be assumed lightly that Congress intended to cancel out two highly important statutes without a word to that effect." *Ely* v. *Velde*, 451 F.2d 1130, 1136 (4th Cir. 1971).[24] The same analysis can be applied to this case. The congressional solution to the problem of excess federal involvement in matters of program choice and administration need not be read so broadly as to encompass in the concept of "program administration" the freedom to discriminate on otherwise prohibited grounds or to operate programs free from existing regulations regarding the nondiscrimination statutes. We believe, instead, that it is more likely that the lessened federal involvement anticipated by Congress was to be achieved by allowing state and local authorities to choose how best to use their allocations in programs or activities best suited to the needs of their citizens.[25]

There are several indications that this interpretation is consistent with congressional intent. Clearly, the Administration believed that its block grants were capable of coexisting with nondiscrimination provisions, because the Administration's own proposals assumed applicability of the nondiscrimination statutes. There is no indication in the legislative history that Congress itself initiated any effort to eliminate or cut back on the operation of the nondiscrimination statutes with respect to block grants. In fact, the two block grants enacted are described in the legislative debates as "more modest" in terms of centralizing, consolidating, and decreasing federal involvement than those proposed by the Administration. In the numerous attempts to explain the advantages of block grants as minimizing federal interference and maximizing state flexibility, the nondiscrimination provisions were simply not at issue. Moreover, all the block grants share these goals of increased efficiency, decreased regulation, and increased local autonomy, including the six containing nondiscrimination provisions. It thus does not appear that application of the nondiscrimination provisions is inherently inconsistent with the block grant concept. It is difficult to conclude,

---

[24] *Ely* v *Velde* relied on the fact that the Safe Streets Act had as a dominant concern not merely the "simple desire to give the states more latitude in the spending of federal money," but also "to guard against any tendency towards federalization of local police and law enforcement agencies " Application of NHPA and NEPA did not threaten federalization of local police efforts *See* 451 F 2d at 1136 Although the question before the court in *Ely* is not identical to the question before us, we think it is similar to the extent that the block grants not only reflect concern about who decides how to spend federal money but also reflect concern that the federal government not be involved in the details of *program administration*, which are more appropriately left to local decisionmakers.

[25] This appears to be consistent with the President's understanding of the value of block grants. *See* Interview with the President, 17 Weekly Comp Pres Doc. 1326–27 (Dec 7, 1981)·

> Now, having been a Governor, I can tell you what the categorical grants do. They come to you with Federal money, but with enormous amounts of *redtape and regulation prescribing exactly what the priorities are and how this money must be spent* Well, no one in Washington can set rules of that kind that will fit New York City and some small town in the urban area or a city in the South that doesn't have the same problems or the West So, it makes these programs needlessly extravagant.

(Emphasis added )

111

therefore, that Congress viewed the nondiscrimination statutes as inconsistent with its purpose in enacting block grants.

The policy disfavoring "repeals" or "amendments" by implication is particularly applicable when the allegedly repealed provision is a longstanding, important component of a government program. *See Morton* v. *Mancari*, 417 U.S. 535, 550 (1974). The cross-cutting statutes clearly represent important federal nondiscrimination policies of broad applicability. It is difficult, if not impossible, to believe that Congress would choose to alter such fundamental policies without any discussion, and in the context of debates over the block grants, which focused on different concerns unrelated to the policies embodied in the nondiscrimination laws. Because the policies inherent in the nondiscrimination statutes and the block grants may be reconciled without apparent serious damage to either, as indicated by the fact that other block grants and the Administration's own proposals specifically adopted nondiscrimination provisions—in fact, added to the categories of prohibited discrimination—the nondiscrimination statutes should be considered to apply to the block grants. *See, e.g., Morton* v. *Mancari*, 417 U.S. 535; *Ely* v. *Velde*, 451 F.2d 1130.[26]

## VI. Conclusion

The circumstances surrounding enactment of the two block grants, as well as the purposes for which they were enacted, do not reveal a congressional intention to make the nondiscrimination statutes inapplicable to the Education and the Social Services Block Grants. The nondiscrimination statutes were intended to be statements of national policy applicable to all programs or activities receiving federal financial assistance, freeing Congress from the need to give subsequent consideration to their applicability on a program-by-program basis. Block grant funding falls within the literal terms of those statutes, and the nondiscrimination statutes should therefore be applied to these two block grants unless Congress actually intended otherwise, or unless the block grants and the nondiscrimination statutes cannot be reconciled so as to give effect to all. That Congress failed to include nondiscrimination provisions in the two block grants does not support a finding of an intention to make Title VI, Title IX, Section 504, and the Age Discrimination Act inapplicable: The nondiscrimination statutes do not require specific reference in funding legislation; Congress may have included nondiscrimination provisions in other block grants to effect changes in existing discrimination law; and Congress' failure to include nondiscrimination provisions in the two block grants can be interpreted as an expression of intent to have

---

[26] We believe that this conclusion is not inconsistent with *Pennhurst State School & Hospital* v *Halderman*, 451 U S. 1 (1981), in which the Court stated that "Congress must express clearly its intent to impose conditions on the grant of federal funds so that the States can knowingly decide whether or not to accept those funds." *Id.* at 24 In the four cross-cutting nondiscrimination statutes themselves, Congress had clearly expressed its intent that they apply generally to all programs or activities receiving federal financial assistance. *See* 110 Cong. Rec. 7063 (1964) (remarks of Sen. Pastore) (Title VI fixes the conditions under which federal money is distributed "No one is required to accept Federal assistance or Federal funds If anyone does so voluntarily, he must take it on the conditions on which it is offered ").

existing law apply. Finally, the block grants and the nondiscrimination statutes are not so irreconcilable that both cannot be given effect.

In light of the fundamental expression of congressional intent underlying the nondiscrimination statutes, it should be presumed that Congress would have debated or made specific its intent to change their applicability. As long as it did not do so, and in light of the several possible reasons for its failure to include independent nondiscrimination provisions, we conclude that the nondiscrimination provisions of Title VI, Title IX, Section 504, and the Age Discrimination Act apply to the Education and the Social Services Block Grants.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*